JOSEPH M. WATTE ET AL. V. CHARLES WICKERSHAM
ET AL.

[FILED OCTOBER 3, 1889.]

27  457
37  785
27  457
59  776

1. Evidence examined, and *held*, to sustain the verdict.

2. Wagering Contract: GRAIN OPTIONS: EVIDENCE. Evidence offered on the part of the defendants that they were unable to pay for grain and pork purchased; that they were not the owners of elevators or other means of receiving or storing grain in Nebraska; and that they did not own or have possession of any grain, and particularly of the grain sold, at the time they ordered the plaintiff to sell grain testified to, *held*, properly admitted in connection with evidence that such facts were known to the plaintiffs at the time.

ERROR to the district court for Lancaster county. Tried below before CHAPMAN, J.

*Talbot & Bryan,* for plaintiffs in error:

That construction of a contract is to be adopted which will support rather than avoid it. (*Bigelow v. Benedict,* 70 N. Y., 202; *Clay v. Allen,* 63 Miss., 426.) The burden of proving the contract illegal is upon defendants (*Irwin v. Williar,* 110 U. S., 499; *Cockrell v. Thompson,* 85 Mo., 510); and there must be more than a mere suspicion of illegality. (*Rumsey v. Berry,* 65 Me., 570; *Story v. Coleman,* 71 N. Y., 420.) Delivery by warehouse receipts does not make the contract illegal. (*Wall v. Schneider,* 59 Wis., 352; *Gregory v. Wendell,* 39 Mich., 337.) The testimony shows that the only option was as to the time of delivery, and such contracts are valid. (*Pixley v. Boynton,* 79 Ill., 351; *Logan v. Musick,* 81 Id., 415; *Harris v. Tumbridge,* 83 N. Y., 99.) Plaintiffs' testimony shows that no "puts" and "calls" transaction took place, and even if it had, some courts have held such deals not necessarily invalid. (*Thacker v. Hardy,* 18 Am. L. Reg. [N.

S.], 258; *In re Chandler*, 13 Id., 310; *Ex parte Young*, 6 Biss. [U. S. C. C.], 53.) The controlling element in all such transactions is the *intention* of the parties (Newmark on Sales, sec. 369; *Clark v. Foss*, 7 Biss., 740; *Gilbert v. Gauger*, 8 Id., 214; *Kirkpatrick v. Adams*, 20 Fed. Rep., 287; *Ward v. Vosburg*, 31 Id., 12; *Sawyer v. Taggart*, 14 Bush [Ky.], 727; *Kent v. Miltenbergher*, 13 Mo. App., 503; *Tomblin v. Callen*, 69 Ia., 231; *Hatch v. Douglas*, 48 Conn., 116); and an illegal purpose of one party, not shared by the other, does not make the contract illegal. (*Cockrell v. Thompson*, 85 Mo., 510; *Williams v. Tiedemann*, 6 Mo. App., 269; *Murry v. Ocheltree*, 59 Ia., 435; *Whiteside v. Hunt*, 97 Ind., 191; *Earl v. Howell*, 14 Abb. N. C., 474; Benjamin on Sales, Bennett's 4th ed., sec. 542, Am. N.) Defendants have failed to prove that there was no intention of delivery. The broker has a right to commission. (*Roundtree v. Smith*, 108 U. S., 269, and cases *supra*.)

*Lamb, Ricketts & Wilson*, for defendants in error:

The fact that defendants never owned nor controlled the actual products in which they dealt, and that this was known to plaintiffs, goes far to determine the intention of the parties (*Melchert v. Telegraph Co.*, 3 McCrary [U. S. C. C.], 521, [S. C. 11 Fed. Rep., 193]; *Lyon v. Culbertson*, 83 Ill., 38); also the fact that the money received by plaintiffs was asked as margins only (*Maxton v. Gheen*, 75 Pa. St., 166; *Fareira v. Gabell*, 89 Id., 89; *North v. Phillips*, Id., 250; *Ruchizy v. DeHaven*, 97 Id., 202; *Dickson v. Thomas*, Id., 278; *Flagg v. Baldwin*, 38 N. J. Eq., 219; *Justh v. Holliday*, 11 Wash. L. Rep., 418); also the fact that defendants were known by plaintiffs to be unable financially to receive the produce represented in the transactions. (*Colderwood v. McCrea*, 11 Bradw. [Ill. App.], 543; *Beveridge v. Hewitt*, 8 Id., 467; *Patterson's Appeal*, 16 Rep., 59; *First National Bank v. Packing Co.*, 23 N. W. Rep., 255; *In re Green*, 7 Biss. [U. S. C. C.], 338;

*Kirkpatrick v. Bonsall*, 72 Pa. St., 155.)    Another circumstance in determining the intention of parties is the prior course of dealing, and in this case settlements had always been made by adjustment of differences.    (*Colderwood v. McCrea, supra.*)    The fact that no grain was ever offered or demanded, strongly indicates that no delivery was intended.    (*Whiteside v. Hunt*, 97 Ind., 191, and cases *supra.*)

. COBB, J.

This cause was brought to this court on error from the district court of Lancaster county.

The plaintiffs in error, Joseph M. Watte, Frank H. Axtell, and Finley A. Forbes, partners by the firm name of Elmendorf, Watte & Co., alleged, in the court below, that they had been and were doing business as general commission merchants in grain and provisions in this state, and at Chicago, Illinois; and that Charles A. Wickersham and Henry B. Ware, defendants, were doing business at Lincoln, as partners; that the defendants had been engaged in buying and selling grain and provisions through plaintiffs as agents; that on October 12, 1886, the plaintiffs rendered their account current with defendants, by which there was due plaintiffs a balance of $1,155.06, with interest at seven per cent, which the defendants promised to pay, but neglected and failed to do; with demand for judgment, etc.

The defendants answered denying every allegation; and for a second defense set up that the plaintiffs solicited them to embark in speculations in options in grain and pork on the Chicago market, and that by an agreement they put up in the hands of the plaintiffs certain sums of money as margins and guaranty to cover any decline and loss in the market value of such articles of produce as they ordered and purchased options upon; that it was agreed that they were to be liable to the plaintiffs only for the difference

between the options and privileges ordered and purchased for them, and the real market value of the articles subsequently, and that the plaintiff should hold such margins as security for any sums that might be found due them for decline and losses in the price and value of grain and produce on settlement of differences in the purchase and sale of the same on their account; that defendants never agreed to receive any produce bought, or to deliver any sold, and that all transactions by the plaintiffs on their account were speculations merely on the rise and fall of the market at the produce exchange in Chicago; and were wagers on that result and event, and were gambling transactions superinduced by the plaintiffs for their benefit and profit, and that they ought not to recover any part thereof, because all of such contracts, and option gains and losses, were illegal and void.

The plaintiffs replied denying all the allegations of defendants.

There was a trial to a jury with a verdict for the defendants and a judgment for the defendants' costs.

The plaintiffs' motion for a new trial was overruled, and exceptions duly entered on the record, and a bill of exceptions settled and allowed.

The action was brought as upon an account stated; but the plaintiffs did not rely upon their evidence, which they introduced to prove the delivery of the statement of the account to the defendants, and their admission of its correctness, either by express words or by its retention without objection, or offer to return it for sufficient length of time to raise by presumption an admission of its correctness, and a promise to pay it; but, on the contrary, virtually waived and abandoned any advantage which they may have possessed, by reason of their account having been stated; and introduced witnesses, as well as documentary evidence, to prove their claim without reference to the advantage of an account stated. In reviewing the case, there-

fore, I will not deem it necessary to refer to those portions of the evidence, the instructions, or the brief of counsel, which relate exclusively to the subject of account stated, but will endeavor to treat the case as the parties did — as I conceive. But here I am met by a difficulty of considerable magnitude: Was it an action for money had and received by the defendants of and from the plaintiffs, money laid out and expended by the plaintiffs for the use and benefit of the defendants, at their request, or for work and labor performed by the plaintiffs for the defendants at their request?

The "Statement of Account," attached to the petition, fails to aid us at all in the matter. I here copy it:

*Statement of Account.*

CHICAGO, Oct. 12, 1886.

Messrs. WICKERSHAM AND WARE, *Lincoln, Neb.*,

*In Account with* ELMENDORF, WATTE & Co.

*Dr.*                                                              *Cr.*

| Date. | | Days | Int. | | Date. | | Days | Int. | |
|-------|---|------|------|--------|-------|-----|------|------|------|
| Sep. 29 | Ac.P&S | | | 575 | Aug. 31 | Bal. | | | 156 25 |
| 30 | | | | 368 75 | Sep. 2 | P&S | | | 62 50 |
| | | | | 220 | 18 | Cash | | | 250 |
| | | | | 181 25 | 23 | | | | 400 |
| Oct. 2 | | | | 6 25 | | Bal. | | | 1155 |
| 12 | | | | 72 50 | | | | | |
| | | | | 506 25 | | | | | |
| | | | | 93 75 | | | | | |
| | | | | 2023 75 | | | | | 2023 75 |
| Oct. 11 | Balance | | | 1155 00 | | | | | |

E & O E                              Exhibit A.

On the trial the plaintiffs introduced in evidence eight duplicate statements of transactions between them and defendants with evidence that the originals were forwarded to the defendants on or about their respective dates.  One of these statements I here reproduce:

*No. 169 28.*                     CHICAGO, April 28, 1886.
                *Account Purchase and Sale of 5000 bu. May wheat,*
ELMENDORF, WATTE & Co.
       *For account and risk of* Messrs. WICKERSHAM AND WARE,
*Folio 136.*                              *Lincoln, Nebraska.*

| April 22 | Bt 5000 Bu. May wheat | 80½ | 4025 | |
| | Commission | | 12 50 | |
| | | | | 4039 50 |
| April 27 | Sold 5000        "        "        " | 78⅝ | | 3931 25 |
| | Loss | | | 106 25 |

                              ELMENDORF, WATTE & Co.

It will be observed that in neither of these accounts is there any charge for cash paid or advanced by the plaintiffs for or on account of the defendants, nor is there any such allegation in the petition.  Yet the petition does contain an allegation that "the defendants were at the times herein mentioned, and for several months prior thereto had been, engaged in buying and selling grain and provisions through plaintiffs as agents, and plaintiffs from time to time rendered statements to the defendants, showing the business transactions between plaintiffs and defendants." The allegations that the plaintiffs as agents were the medium through which the defendants were engaged in buying and selling grain and provisions, and that they rendered statements to the defendants showing the business transactions between plaintiffs and defendants, are the only allegations of fact tending to state a cause of action on the part of the plaintiffs against the defendants, aside from the allegation of an account stated, which as we have seen was virtually waived and abandoned on the trial.

But it may be that the defendants by their answer supplied sufficient facts upon which to base the principal questions argued in the briefs.

William Dillon, a witness on the part of the plaintiffs, testified that the plaintiffs reside and have a place of business in Chicago, where they are heavy shippers and receivers of grain; that witness resides at present in Chicago, but that he lived in the city of Lincoln about nine years; and it appears from his testimony that he resided in the latter city during the time of most or all of the transactions between plaintiffs and defendants, during all of which time he was employed by the plaintiffs, soliciting consignments and getting parties through this country to do their business with the plaintiffs' firm; that while he lived in Lincoln the defendant, Ware, lived right across the street from him; that he also knew the defendant, Wickersham, for six or eight years. The balance of the testimony of this witness relates to the rendition of the account to the defendants, and conversations between witness and the defendants as to its payment; which, as above stated, in the view which I take of the case, as finally presented, it is unnecessary to set out or comment upon.

The plaintiffs then presented and read in evidence the depositions of Frank F. Axtell, Joseph M. Watte, and Finley A. Forbes, all members of the plaintiffs' firm, but as that of Mr. Axtell only is commented on by plaintiffs in the brief, and the others alleged to be the same in substance, I will confine my observations to the facts stated by him so far as the depositions are concerned. This deponent testified that the general character and nature of the business done by the defendants with his firm was buying and selling grain and pork for future delivery; that Dillon was in the employment of said firm to solicit business; that he had no authority to act for the plaintiffs in negotiating or making arrangements or arriving at understandings with the defendants on the board of trade in the

city of Chicago, or anywhere else, for the sale and purchase of grain, wherein the seller had the privilege of delivering or not delivering the grain, and the buyer the privilege of calling or not calling the grain; that he had no authority to act for said firm in negotiating or making arrangements or understandings with the defendants to make fictitious purchases or sales of grain for or on account of the defendants on the board of trade in Chicago, or anywhere else; or to speculate in differences for or on account of defendants as to the market value of grain; that he had no authority to represent or act for said firm in negotiating or arranging or arriving at understandings with the defendants, whereby said firm could make purchases or sales of grain for future delivery for or on account of the defendants on the board of trade in the city of Chicago or elsewhere; wherein it was understood, or to be understood, that no grain should be delivered by the seller or was to be received by the purchaser on account of such sales or purchases. He also testified that plaintiffs' firm had no understanding or agreement with the defendants, so far as he knew, concerning any dealings in options on the board of trade in Chicago or any place else, or buying or selling grain for future delivery; in which dealings, buying and selling, it was understood between plaintiffs and defendants that no actual grain should be dealt in, either bought or sold, received or delivered. The plaintiffs had no understanding, arrangement, or agreement with the defendants with respect to making fictitious sales of grain for future delivery, or otherwise, wherein no grain in fact was ever bought or sold; and that the plaintiffs had no agreement or understanding with the defendants with respect to speculating as to the market value of grain.

This deponent also testified that the business of the firm of plaintiffs with defendants was conducted by means of telegrams and letters; that it was the duty of deponent generally in plaintiffs' business to fill orders coming to them

on the board of trade for the purchase or sale of grain for future delivery. In answer to the question as to how he did that work, he answered, that if he had an order from defendants to buy 5,000 bushels of wheat for future delivery, they naming the month, he went in the market and bought it at the market price and wired them immediately. The same as to sales; if he had an order to sell grain for future delivery for their account, he went in the market and sold it at the market price and notified them promptly; that the plaintiffs made no transactions with the defendants wherein said firm, in dealing with the defendants, or acting for them, or on their account, made any alleged purchase of grain for said defendants or on their account on the board of trade in the city of Chicago or elsewhere commonly known as *option* deals; wherein the seller had the privilege of not delivering the grain, or of delivering it, and the purchaser the privilege of calling, or not calling the grain, and wherein any such alleged purchases were merely fictitious, and whereby the defendants and plaintiffs were speculating in advances in the market value of grain and nothing else; that the plaintiffs had no transactions with the defendants, or on their account, in which grain purchased by them, or on their account, was not actually contracted for by the plaintiffs, for which they were liable, and for which they paid. The deponent then narrated specifically the date and manner of filling each of the orders of the defendants for the purchase and sale of grain and pork, which resulted in the several items of loss constituting the amount sued for. He also introduced telegrams from the defendants directing each of such transactions except the last sales, and letters between the parties in reference to them. He also explained the meaning of the word "margins" as used in the transactions and correspondence between plaintiffs and defendants; he also explained what is meant by "future delivery." I quote his testimony :

A. Future delivery is the purchase of grain for delivering

30

during a month named in the future, named at the time of the purchase.

Q. Mr. Axtell, when you go to the board of trade and purchase, say 5,000 bushels of May corn, what kind of a contract do you make at that purchase; what I mean to say is this, are there any conditions in that contract?

A. It is an absolute purchase, the only conditions are that the seller has the whole month in which to deliver the grain, but he must deliver it during the month named; *or settle for the same.* (The italics are mine.)

Q. Now, Mr. Axtell, in all these purchases and sales that the plaintiffs had with the defendants in this case, were the purchases and sales so made, and were they settled for and delivered according to the terms of the purchase and sale?

A. Yes, sir.

The deponent also testified that it was the intention of the plaintiffs in this case to actually deliver the grain sold, or settle for the same, and to actually receive the grain bought under the orders from the defendants; he also testified that the plaintiffs were never notified by the defendants that they considered their transactions with the plaintiffs to be illegal, being optional deals and based upon gambling contracts; and that deponent first learned that the defendants considered these transactions as growing out of illegal contracts after "we had sued them;" that the plaintiffs never knew that the defendants did not own, or could not deliver, any grain or pork; that the plaintiffs never knew that the defendants did not contemplate or intend that the defendants should become the purchasers of any grain or produce, or that the grain or produce that plaintiffs were ordered to purchase would never be delivered. I again quote from deponent's testimony:

Q. State whether or not the defendants in this action owned or controlled grain or produce upon which you expended any money.

A. They bought and sold grain through us here.

Q. Well, did they own the grain?

A. Yes, or we owned it for them.

Q. You held it as their agents?

A. Yes, as their agents.

On his cross-examination the deponent testified that the purchase of 5,000 bushels of December corn at 37½ cents per bushel, by plaintiffs for and on account of defendants, on October 5, was made from John Hill, Jr.; that on October 11, plaintiff sold to Poole & Sherman 5,000 bushels December corn at 35⅝. I again quote:

Q. Now, one of these deals simply closed the other?

A. So far as Wickersham & Ware were concerned, it did.

Q. And so far as your firm was concerned, it did?

A. No, sir.

Q. Except that you charged them with a loss of $93.75, including your commission?

A. Well, that closes as far as Wickersham & Ware are concerned, but not as far as we are concerned, because we have to satisfy both contracts made.

*        *        *        *        *        *        *        *

Q. Were either of those ever delivered to you?

A. It was either delivered or settled for.

Q. Which was it? The purchase of October 5, 5,000 bushels of December corn, was that ever delivered to you?

*        *        *        *        *        *        *        *

Q. Well, which was it?

A. John Hill actually delivered us that 5,000 of corn.

Q. Where?

A. On the floor of the Exchange hall.

Q. How?

A. The first day of every month all members of the Exchange, that have grain coming to them, are obliged to be in the Exchange room, ready to receive that grain; or if the seller wishes, he can deliver it any other place.

Q. How? What was the evidence of the receipt?

A. The receipt for 5,000 bushels of No. 2 corn stored in a warehouse in Chicago, or within fifty bushels of 5,000 bushels.

Q. That was the first day of December, 1886, that was delivered to you?

A. Yes, December corn.

Q. You had already sold it on October 11?

A. Yes, sir.

Q. And closed Wickersham & Ware's account, so far as that transaction was concerned?

A. No, sir.   If there had been a loss in our receiving that corn, or delivering it, we should have held Wickersham & Ware for the loss.

Q. Look at the paper I now hand you, is not that a copy of the account of this 5,000 bushels December corn-deal, rendered to Wickersham & Ware on the 12th day of October, 1886?

A. Yes, sir.

Q. This shows a loss to them in the transaction, 5,000 bushels December corn, of $93.75?

A. With commissions added, yes.

Q. Had they paid that $93.75 at that time, that would have closed that deal so far as they were concerned, would it not?

A. It would, provided the deals had gone through all right; I will explain right here: It is customary for the commission man to look out for his own deliveries, and see that they go through all right, but they do not consider themselves responsible if there is a loss in receiving, or delivering it.

Q. Who owned this corn from the 11th day of October, at the date of the closing of the Wickersham & Ware account, up till the first day of December, when it was delivered to you?

A. Now that is a question I cannot answer; I don't know who did hold these receipts; we had the corn bought.

Q. What did you do with the corn after December 1, 1886?

A. We delivered it out on contracts that we had sold to be delivered in December.

Q. Was it delivered on any of Wickersham & Ware's accounts?

A. Well, I can't tell you that; I can answer that question by stating that it was delivered to parties that we had corn sold to, either for Wickersham & Ware, or some other of our customers.

Q. Have you any method by which you can follow this particular 5,000 bushel deal, and keep it separate from all others and show what was done with it after the 1st of December?

A. I delivered it out again on the first of December to H. L. Flint & Co.

Q. Of whom did you receive at that day?

A. John Hill, Jr.

Q. Did Wickersham & Ware owe any corn at that date to the persons to whom you delivered it?

A. That corn received from John Hill, Jr., was delivered to H. L. Flint & Co. on a sale of 5,000 bushels December corn, made November 30, at 37⅔ cents.

Q. By whom?

A. Probably by me.

Q. On whose account?

A. Account of I. W. Brown.

Q. Then will you explain how it is that on December 1, you delivered to Flint, and cancelled Brown's obligation, the corn that you had already bought for Wickersham & Ware?

A. Because probably, the sale that we had made for Wickersham & Ware to Poole & Sherman was either settled for before that time by consent of ourselves and Poole & Sherman, and so we delivered to other parties.

The evidence on the part of the defendants was to the

effect that the defendants reside in the city of Lincoln, in this state; that their business and occupation was that of train dispatchers in the employment of one of the railroads there, where they resided, and in which occupations they were engaged during the whole time of the transactions involved in this controversy; that they, nor either of them, were possessed of capital or means sufficient to purchase and pay for any considerable amount of grain, produce, or other property; that they never were the owners of grain, pork, or other produce, to sell or ship, and that all of this was known to William Dillon, the agent and business solicitor of the plaintiffs; that they had both known Mr. Dillon for several years, but first met him in business relations shortly before the commencement of the dealings between them and the plaintiffs, out of which this controversy arose, at a place in the city of Lincoln, which the defendants designate as a "bucket shop;" that Dillon, knowing defendants to be to some extent dealing in options at said "bucket shop," solicited them to do business of a similar character directly with the plaintiffs, giving them plaintiffs' card, with his own name thereon as agent or solicitor. Defendants then had an understanding with Dillon that they would do business with the plaintiffs, whereupon Dillon wrote to plaintiffs to that effect, and directed the defendants to deposit money in one of the banks of Lincoln which he designated, subject to the order of plaintiffs to cover margins, which they did. The defendants then commenced making orders or requests on the plaintiffs to buy grain on their account on the board of trade of Chicago. I quote from the testimony of defendant Wickersham:

Q. State in what way the margins were deposited.

A. As a rule we tried to have from one to two cents, that is, two cents on a bushel of grain. We had two cents margin on it and deposited that amount; if we bought 5,000 bushels we would deposit two cents a bushel on that in the First National Bank, subject to their call.

Q. What took place after that? Follow the business right along down.

A. We kept dealing with them, and I would frequently see Dillon at the depot and talk the matter over. He knew, of course, the deals we had, and he would ask about and give us advice on it, but our advice did not hit. He was on one side and we were generally on the other; in fact we did not feel like changing to his, but that don't amount to much, but the matter would be talked about when we would meet.

Q. With whom were the arrangements made in regard to putting up the margins?

A. Mr. Dillon; also with the house; Mr. Dillon first told us how we wanted to fix the margins; then we had a letter from the house telling us how much to put up, if I am not mistaken.

Q. Go on and state what took place down to the end of the deals.

A. We had several deals with them.

Q. Does this statement which I now put in evidence represent those deals?

A. Yes, sir.

Q. Those were received from the house?

A. Yes, sir, through the mail; and at last we got to dealing without a margin; hadn't any money to pay, and they kept writing and sending us drafts, and one draft in particular we got notice from the bank that it had to be paid or it would go to protest; and we went around and deposited it, and it was a very hard time in the market so far as we were concerned. They commenced to go down, and we were on the wrong side of it; and at last we got a message from them in cipher, "tid-bits," which means, "margins exhausted, we have closed the deal."

Q. State whether or not you always put up the two cents margin in the First National Bank before you made the order.

A. As a rule we did, but I am not positive; but I think there were some times that we didn't, and they carried us.

Q. How was it at the last?

A. No, sir; we didn't have anything in the bank.

Q. State whether or not, when you made any of these sales of grain that are mentioned in these several statements of sales and purchases—state whether you had at any of those times any of that wheat on hand.

A. No, sir.

Q. State whether or not, when you made any of those sales of grain through them, if you had any intention of ever delivering any of the grain.

A. No, sir.

Q. State when you made any of these large purchases of grain whether at that time, if any of that grain had been delivered, if you had any money to pay for that grain.

A. No, sir.

Q. State whether or not, in April, you and Mr. Ware were financially able to make any of these large purchases of grain or pay for them.

A. No, sir.

Q. State whether or not, at the time you made any of these purchases, you had any intention of receiving the grain and paying for it.

A. No, sir, I never did.

Q. State at the time you made any of these sales of grain or pork if you had any intention of delivering this fifty thousand bushels of wheat or anything of that kind, or any of these amounts of wheat.

A. No, sir, that was not the intention.

Q. State whether or not Mr. Dillon ever asked you as to whether you had any grain in store in Nebraska or not.

A. He never asked me that question.

Q. State whether or not Mr. Dillon ever called upon you for money to pay for the purchases of any of these items of wheat or produce.

A. No, sir, he never asked for that.

He also testified that the plaintiffs never wrote to defendants for money to pay for those large items of produce purchased; that defendants were never in business in Chicago, except in this matter; that defendants never had funds in Chicago sufficient to pay for these large quantities of wheat; that defendants were never financially able to pay for any of these large items of purchase, nor to pay $12,493.00 for wheat purchased; that defendants never had any actual wheat, corn, or pork on hand; that on none of those deals that defendants made through plaintiffs was any of the produce bought or sold, delivered to or by defendants, or to his knowledge, to the plaintiffs for them.

The testimony of defendant H. B. Ware was substantially the same as that of Wickersham.

The evidence in this case, both on the part of the plaintiffs and the defendants, is substantially the same as that in the case of *Sprague v. Warren*, decided by this court at the last term, and reported in 26 Neb. at p. 326; I am unable to distinguish the facts of this case from those of that. The status and condition of the defendants, in the case at bar, was, at the date of the transactions involved, substantially the same as that of the defendant Sprague in that case, and Fisher, his partner. In both cases the defendants were men whose residence, business, avocation, and employment were such as to give notice to the person dealing, or coming in contact in business relations with them, that any purchases or sales which they might make, or desire to make, of grain, or pork on the board of trade of Chicago were mere wagers on the fluctuations in the values of such products, and that they possessed neither the intention nor the ability to actually produce and deliver large quantities of wheat, corn, or pork in the Chicago market; or to receive and ship or otherwise legitimately utilize such produce, if delivered to them there. In the case at bar the evidence is ample that the plaintiffs, through

their agent, William Dillon, had notice of this status and condition of the defendants.

In the case above cited, one of the plaintiffs in his deposition described the manner of settling losses in deals on the board of trade. In the case at bar the plaintiff, Mr. Axtell, in his deposition, described the process by which such settlements are effected. They both call it delivering and receiving grain and pork; but the thing described falls far short of it. With the exception of the use of the phrase "rung up," by Mr. Warren in the former case, which phrase is not used by Mr. Axtell in the case at bar, the two descriptions of the method of settling losses in deals on the board of trade are substantially the same. In the case of *Sprague v. Warren, supra,* the court in the opinion says: "Real contracts for the delivery of property at a future time will be sustained, because parties then deal with actual property. Where, however, there was no intention to deliver the property, but simply to pay the difference between the contract price and the price on the day agreed upon, the contract will not be enforced; as in fact it is a mere wager." In the case at bar, it is clearly shown, by the testimony of the defendants, that it was never their intention to actually receive and pay for any of the grain or pork nominally bought; nor to deliver and receive pay for any nominally sold by them on their account; and there is no evidence as to intention of the parties of and to whom these nominal purchases and sales were made; and while it may be admitted that the plaintiffs were at all times faithful to their duties, as agents of the defendants, as contended by counsel in the brief, and while it was doubtless their intention at all times to do precisely what they did do, yet, as we have seen, their intention to do that was not an intention to buy or to sell actual bushels of wheat and corn or barrels of pork *in specie;* and indeed, as agents of the defendants, their intention doubtless was, as it should have been, to carry out their principal's intentions.

Following the case of *Sprague v. Warren, supra,* which was carefully considered, though the opinion was only agreed to by a divided court, I hold that the verdict is sustained by the evidence, and is not contrary to law.

Plaintiffs in the brief present as error on the part of the trial court the admission of testimony on the trial on the part of defendants, in which they testified that they were unable to pay for the grain and commodity purchased; also testimony of the defendants as to whether they owned grain elevators, etc. This testimony, in connection with evidence that their inability to pay for such purchases, as well as the fact of their not being the owners or controllers of elevators or otherwise engaged in storing, shipping, or handling grain, but that they were engaged in a different business and avocation, was known to plaintiffs through their agent Dillon, was admissible as going to the question of intention, and of the real character of the transactions between the plaintiffs and the defendants. The above also applies to plaintiffs' objection to the admission of testimony on the part of defendants that they did not own or have possession of any grain, and particularly of the grain sold at the time they ordered plaintiffs to sell the grain testified to by them.

I have carefully examined the instructions given and refused, but find no error in their giving or refusal, and will not therefore further extend this opinion by reproducing or commenting upon them.

The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other Judges concur.