Oscar Mohr and others *vs.* Anton Miesen.

October 2, 1891.

**Illegal Contract — Sale — Contracts for Future Delivery, when Illegal.**—Contracts for the sale and delivery of grain or other commodities, to be delivered at a future day, are not *per se* unlawful where the parties in good faith intend to perform them according to their terms. But contracts in form for future delivery, not intended to represent actual transactions, but merely to pay and receive the difference between the agreed price and the market price at a future day, are in the nature of wagers on the future price of the commodity, and void.

**Same—Burden of Proving Illegality.**— The burden of establishing the illegality of such transactions rests upon the party who asserts it.

Same—Extrinsic Evidence.—The form or language of the contract is not material, but inquiry may be made into the facts and circumstances attending or connected with it, in order to determine its real character.

Same—Advances by Agent for Principal to Aid in Dealing in "Futures," when not Recoverable—Evidence Admissible to Defeat Recovery.—The law will not enforce a contract in favor of a party who has entered into it for an unlawful purpose. A broker or commission merchant who makes advances for his principal and aids him in "operating in futures," with notice of the unlawful intent of the latter and of the real character of the transactions, cannot recover his commissions and advances, and, in order to show that he is cognizant of the illegality, evidence may be received on the trial, and considered by the jury, showing the nature of the transactions, the relations of the parties, the course of dealing between them, the occupation and financial ability of the principal, and other material facts tending to prove notice.

Same—Presumption as to Law of State where Contract was Made.— In the absence of proof of the statutes of a sister state, the common-law rule will be applied in determining the legality of contracts made in that state.

Appeal by defendant from an order of the district court for Ramsey county, *Otis*, J., presiding, refusing a new trial after a verdict of $2,005.78 for plaintiffs. The jury found specially that "the arrangement between plaintiffs and defendant with reference to the transactions in controversy contemplated the purchase and sale of actual grain for future delivery, and did not contemplate the making of gambling contracts only," and also that "the contracts in evidence were made by and between the plaintiffs and other members of the chamber of commerce, for the purchase and sale of grain actually to be delivered by warehouse receipts, if either party to them should require it, and that said contracts were not simply gambling contracts."

*Jno. H. Ives*, for appellant.

*C. H. Hamilton* and *Morris & Williams*, for respondents.

VANDERBURGH, J. The plaintiffs sue defendant for money paid and expended for his use in the purchase and sale of grain. The answer sets up that the purchases and sales referred to were not actual or veritable purchases and sales of grain, but were merely colorable, and "were gambling transactions, whereby the plaintiffs in form un-

dertook to buy and sell on the Chicago or Milwaukee boards of trade, ostensibly for future deliveries, but without any intention or expectation on the part of the plaintiffs or defendant that the same would be actually delivered, large quantities of wheat and barley, with the expectation and intention on the part of both plaintiffs and defendant of wagering on the market prices, and that the amounts which defendant would win or lose would be governed by and determined upon the fluctuations in the quotations of the boards of trade." The record shows that the plaintiffs were members of the Milwaukee chamber of commerce, and were brokers negotiating purchases and sales of grain, and accustomed to buy upon margins under the rules of the chamber, and to make advances for customers, and to charge commissions for their services. The defendant during the time of the transactions in controversy was a dealer in wines and liquors in the city of St. Paul. These transactions opened by the receipt by plaintiffs of a telegraphic dispatch from the defendant on November 11, 1886, directing them to "sell ten thousand bushels May wheat." On the following day they accordingly executed the order. February 10th defendant directed the plaintiffs to buy 10,000 bushels May wheat, which order was in like manner executed the same day. This closed the transaction, so far as the defendant was concerned. The two contracts were adjusted on the basis of the difference in prices at the dates specified, and a statement showing the difference sent to defendant; that is to say, the two contracts were adjusted on the basis of such difference in prices, without waiting for their literal fulfilment, and without any actual delivery of wheat. A large number of other similar purchases and sales of wheat and barley, amounting to hundreds of thousands of bushels, were made by plaintiffs for defendant, and disposed of in like manner, during the year 1887. Some of the "deals" were closed with a profit, others with a loss, to defendant, which was charged up to him by the plaintiffs. During this time the defendant paid out no money for grain whatever, but at plaintiffs' instance, to cover margins for which advances had been made by them on a falling market, he had paid them between the 10th day of November, 1886, and the 1st day of January, 1888, the sum of $2,462.50, leaving due them, as they claim, the amount de-

manded in this action. The last transactions, as per statement sent to defendant by plaintiffs, were the reported sale of 10,000 bushels February barley, December 30, 1887, and purchase of 10,000 bushels February barley, January 3, 1888, difference (loss) reported January 4, 1888, at $275.

Contracts for the purchase or sale of grain or other commodities to be delivered at a future time are not *per se* unlawful, if the parties intend in good faith to perform them by the actual delivery of the property according to their terms. Nor are *bona fide* contracts for the future delivery of goods invalid because at the time of the sale the vendor has not the actual or potential possession of the goods which he has agreed to sell. He may afterwards go into the market and procure the goods which he has agreed to furnish his vendee. Business may be successfully and lawfully conducted in that way; and, where such contracts are intended in good faith to represent actual transactions, they are not unlawful. The law places no unreasonable limitations upon commercial dealings; and it is no legal ground of objection that *bona fide* contracts for future delivery are entered into for the purpose of making a speculation through an anticipated rise in the price of commodities. But contracts in form for the future delivery of goods not intended to represent actual transactions,—that is, the actual delivery and receipt of the goods,— but merely to pay and receive the difference between the agreed price and the market price at a future day, and upon the risk of the rise or fall in prices, are generally held to be in the nature of wagers on the future price of the commodity, and void by statute or as against public policy. The party dealing in futures in substance bets that the price of a commodity at a future day will be a certain sum more or less than the market prices, which involve elements of risk and uncertainty; and the "stake" is the amount of the "margin" required to cover differences in values, and according to the price of the commodity on a future day the parties to the contract must respectively gain or lose. 22 Am. Law Reg. 613, note.

In *Rumsey* v. *Berry*, 65 Me. 570, the accepted doctrine is stated as follows: "A contract for the sale and purchase of wheat to be delivered in good faith at a future time is one thing, and is not in-

consistent with the law; but such a contract entered into without an intention of having any wheat pass from one party to the other, but with an understanding that at the appointed time the purchaser is merely to receive or pay the difference between the contract and the market price, is another thing, and such as the law will not sustain. This is what is called a settling of the differences, and as such is clearly and only a betting upon the price of wheat, against public policy, and not only void, but deserving of the severest censure."

"The bargain represents, not a transfer of property, but a mere stake or wager upon its future price. The difference requires the ownership of only a few hundreds or thousands of dollars, while the capital to complete an actual purchase or sale may be hundreds of thousands of dollars. Hence ventures upon prices invite men of small means to enter into transactions far beyond their capital, which they do not intend to fulfil, and thus the apparent business in the particular trade is inflated and unreal, and, like a bubble, needs only to be pricked to disappear, often carrying down the *bona fide* dealer in its collapse. * * * Such transactions are destructive of good morals and fair dealing, and of the best interests of the community." *Kirkpatrick* v. *Bonsall*, 72 Pa. St. 155.

It becomes material, therefore, to inquire into the intention of the parties in entering into contracts purporting to be for the future delivery of commodities, and the plaintiffs must be shown to be *in pari delicto* to defeat a recovery in this action. The language or form of the contract is not conclusive. The real nature of the transaction and the understanding and purpose of the parties may be shown, notwithstanding the contract is fair on its face. Indeed, in view of the extent to which stock and grain gambling is carried on at the exchanges in the commercial centres of the country,—a fact of which the courts are bound to take notice,—time contracts of the character under consideration will be very carefully scrutinized by the courts, and they will go behind and outside the language of the contract, and look into the facts and circumstances surrounding and connected with it, in order to determine its real character, as in the case of contracts claimed to be void for usury or fraud. In *Barnard* v. *Backhaus*, 52 Wis. 593, 600, (6 N. W. Rep. 252,

9 N. W. Rep. 595,) the court, speaking of contracts for future delivery, went so far as to say that "to justify a court in upholding such an agreement it is not too much to require a party claiming rights under it to make it satisfactorily and affirmatively appear that the contract was made with an actual view to the delivery and receipt of grain, not as an evasion of the statute against gaming, or as a cover for a gambling transaction." The effect of this would be to shift the burden of proof in such cases. The courts of some of the other states have been constrained to adopt the same rule, but upon principle the proposition can hardly be sustained; and the general rule is that the burden of establishing the illegality rests upon the party who asserts it, and such is the great weight of authority in these as well as other cases. It is for the legislature to change the rule in this class of cases, if in its wisdom and for reasons of public policy it shall be deemed necessary for the public welfare. *Crawford* v. *Spencer*, 92 Mo. 498, (4 S. W. Rep. 713, 1 Am. St. Rep. 764,) and cases.

The testimony of the defendant, which is undisputed, shows or tends to show that he *did not intend* to make actual *bona fide* purchases and sales of grain, but intended to "deal in futures" solely, and the manner in which the business was conducted and the several "deals" closed and adjusted by the plaintiffs is consistent with this theory, and tends to support it; and, while this circumstance might not alone be sufficient to establish the fact that plaintiffs, or the third parties with whom they dealt in executing the orders of the defendant, had notice that defendant's object was not to buy and sell grain, but to speculate in the price of grain merely, yet the manner in which the business involving these transactions was conducted was certainly an element to be considered with other circumstances in determining the question of their good faith. *Hill* v. *Johnson*, 38 Mo. App. 383; *Crawford* v. *Spencer*, 92 Mo. 498, (4 S. W. Rep. 713.) It is not necessary to prove that plaintiffs had express notice of defendant's purpose. The understanding between the parties may be gathered from the facts and attending circumstances. This is well settled, and upon this point evidence of the defendant's occupation, residence, financial ability; that he never

delivered or received or proposed to deliver or receive any grain; that he was not a dealer; and that the orders to purchase were made without reference to or far in excess of his ability to pay for, with other facts of like character, was competent. *Cobb* v. *Prell*, 5 McCrary, 85, (15 Fed. Rep. 774;) *Carroll* v. *Holmes*, 24 Ill. App. 453, 458, 459; *In re Green*, 7 Biss. 338, 344; *Crawford* v. *Spencer, supra; Lowry* v. *Dillman*, 59 Wis. 197, (18 N. W. Rep. 4;) *Sprague* v. *Warner*, (Neb.) 41 N. W. Rep. 1115; *Watte* v. *Wickushun*, 27 Neb. 457, (43 N. W. Rep. 259;) *Williams* v. *Tiedmann*, 6 Mo. App. 269, 276; *Hill* v. *Johnson*, 38 Mo. App. 383, 392. The plaintiffs concede that it was apparent from his correspondence that the defendant's transactions were mostly for speculative purposes. They knew he was in the saloon business, and not in the grain business. The jury might find from the facts disclosed by the evidence that the plaintiffs knew that he had not the means to buy grain with, and did not desire or need it, but was operating for the differences only.

The statutes of Wisconsin, where the business was done, were not introduced in evidence. The rights of the parties will therefore be determined by the rules of the common law, as generally accepted and applied in this country. *Harvey* v. *Merrill*, 150 Mass. 1, (22 N. E. Rep. 49.) And it is generally held as the common-law doctrine that all wagering contracts are illegal and void as against public policy. *Irwin* v. *Williar*, 110 U. S. 499, 510, (4 Sup. Ct. Rep. 166;) *Harvey* v. *Merrill, supra*. No cause of action arises in favor of a party to an illegal transaction; nor will the law lend its aid to enforce any contract which is in conflict with the terms of a statute, or sound public policy or good morals. *In re Green*, 7 Biss. 338; *Armstrong* v. *Toler*, 11 Wheat. 258; *Ruckman* v. *Bryan*, 3 Denio, 340. And there is no reason why a broker or commission merchant should be favored or exempted from consequences resulting to other parties who aid or assist in unlawful transactions. *Barnard* v. *Backhaus, supra*. It was through the agency of the plaintiffs that the defendant was attempting to carrying on an unlawful business. They executed his orders, advanced money for margins, and settled the differences. The contracts were all made in their names, and he was not known in the transactions with third parties, and they were person-

ally responsible to the persons with whom they dealt in making the purchases and sales in question. Under such circumstances it would, of course, be difficult to ascertain whether the latter had notice of the nature of the agreement or understanding existing between the parties to this action; but it was clearly important and material to show that the plaintiffs were cognizant of defendant's illegal purposes, and were engaged in promoting them; and, if they were, the court will not aid them to recover moneys advanced in furtherance of such schemes. The plaintiffs, as brokers or commission merchants, might well decline to aid in transactions of that character; and, if they would do so, a great deal of that kind of gambling would cease, as, in the majority of cases, the ventures could not be made without their financial assistance. As between them and their customers, the same strict rule should be applied as in other cases. *Carroll* v. *Holmes*, 24 Ill. App. 453, 460; *Hill* v. *Johnson*, 38 Mo. App. 383; Tied. Sales, p. 490, § 302.

The plaintiffs' counsel, however, concedes in his brief in this court that if, by the arrangement between the parties to this suit, they were to undertake gambling transactions, then the intent of third parties was not material. But the defendant's counsel insists that the charge of the court on this subject, including the instructions asked by plaintiffs, would warrant the jury to infer that it was necessary for the defendant to make it appear that the parties with whom plaintiffs dealt were also *in pari delicto*. Upon this point the charge, taken as a whole, is perhaps not entirely clear, but we think if there was any ambiguity or uncertainty in the charge on the question the defendant should have asked more specific instructions.

It is also assigned as error that the court erred in refusing defendant's second request to charge, which was in substance that, in order to prove notice or knowledge on the part of the plaintiffs of the designs and intentions of the defendant, it is not necessary that defendant should have written or said to any of the plaintiffs that such was his design; but the jury were to determine the understanding of the parties from all the circumstances connected with the transactions between them, and that upon this question they were "entitled to consider the fact that at the time the plaintiffs sold the barley for

the defendant in October, November, and December, 1887, one of the plaintiffs stated that he had no reason to believe that the defendant had the barley at the time of such sales; and the further fact that during a part, at least, of the time of such transactions, the defendant was behind with his margin, and was being pressed by plaintiffs for money to make the margins good; and that plaintiffs immediately after closed these deals, as well as all prior deals, considered the transaction at an end so far as defendant was concerned, and, instead of charging him with the purchase of any wheat, sent him statements charging him with, or crediting him with, as the case might be, the difference between the purchase and the selling price." These instructions were not covered by the general charge, and we think should have been given. Some of the evidence was perhaps of slight importance, but we think, with other facts and circumstances in the case, it was all proper to be considered by the jury in determining the knowledge of the plaintiffs and the real nature of the arrangement between the parties; and without such instructions the jury were in danger of being led to believe, as the court subsequently stated, that there must be an express agreement, and that a mere understanding between the parties was not sufficient.

We think evidence of the general character of transactions in the chamber between other dealers was properly rejected; but for the error above referred to there should be a new trial.

Order reversed.