JOHN C. COLDERWOOD

V.

SAMUEL H. McCREA ET AL.

11    543
101   ¹346

1. GAMBLING CONTRACT.—Time contracts for the sale and actual delivery of a commodity are valid, but if such contracts are made merely as a cover for gambling, without any intention to deliver and receive the commodity, but merely to pay the difference between the price agreed upon and the market price, they are within the statute against gaming, and void. It is a question of the intention of the parties, and not of the form of the contract.

2. INTENTION, HOW SHOWN.—In such cases it is competent, in ascertaining the intention of the parties, to show how they were in the habit of dealing together in respect to like transactions prior to the one in controversy.

ERROR to the Superior Court of Cook county; the Hon. R. S. WILLIAMSON, Judge, presiding. Opinion filed October 26, 1882.

This was assumpsit brought by the defendants in error against the plaintiff in error in the Superior Court of Cook county for money paid and commissions on an alleged purchase and sale of 20,000 bushels of wheat on the Board of Trade of the city of Chicago, by McCrea & Co., as agents of the plaintiff in error, resulting in a loss to the latter of $505, and $50, claimed to be due McCrea & Co. for commission. The declaration contains two special counts on the contract, and the common counts for money paid, and work and labor performed at the defendant's request, etc. The defendant filed a plea of the general issue, and several special pleas setting up in substance, that the supposed causes of action in the several causes in the declaration mentioned, were for moneys claimed to be due to the plaintiffs on account of certain deals and

transactions in speculating on the market price of grain and other commodities; that in each and all of said deals, it was understood and agreed between the plaintiffs and the defendant, that neither the plaintiffs nor defendant were to receive or deliver any of the articles pretended to be bought, sold, or dealt in, and that the loss or gain resulting from any such transactions should be settled by the payment or receipt of differences alone.

Demurrers were sustained to the special pleas, and the cause was tried by the court without a jury, upon the plea of the general issue. The court found for the plaintiffs $556.25, for which sum they had judgment. The defendant brings the case by writ of error, and assigns various errors.

Mr. JOHN G. REID, for plaintiffs in error; that it was a gambling contract and void, cited Tenney v. Foote, 4 Bradwell, 594; same case, 95 Ill. 109; Pickering v. Cease, 79 Ill. 330; Beveridge v. Hewitt, 8 Bradwell, 467.

In order to show the intention of the parties it is admissible to show how they have been in the habit of dealing together in other transactions: Dean v. Duncan, 17 Ill. 272; Packard v. Van Shoick, 58 Ill. 79; Race v. Weston, 86 Ill. 91; Phillips v. Roberts, 90 Ill. 493.

Plaintiffs are not entitled to recover even for commissions, because they grow out of an illegal contract: Nash v. Monheimer, 20 Ill. 215; Henderson v. Palmer, 71 Ill. 579; Tenney v. Foote, 95 Ill. 99.

Messrs. TAGERT & CUTTING, for defendant in error; that if the broker was employed to and did actually buy and sell commodities for the defendant, he is entitled to recover for money expended and services rendered, cited Clark v. Foss, 7 Biss. 540; Lehman v. Strassberger, 2 Wood. 554; Kingsbury v. Kerwin, 77 N. Y. 612; Smith v. Bouvier, 70 Pa. St. 352; Logan v. Musick, 81 Ill. 415; Gregory v. Wendell, 40 Mich. 432.

WILSON, J. As the declaration contains the common counts for money paid, work and labor performed at defendant's re-

quest, etc., and as the contract upon which the suit is brought was wholly executed, and not merely executory, the plaintiffs, if entitled to maintain their action under the proofs, could recover under the common counts. The point made by the plaintiffs in error as to a variance between the proofs, and the contract declared upon in the special counts is, therefore, unimportant, and need not be considered.

Were the plaintiffs entitled to recover upon the facts?

We have had occasion so frequently to express our views of the law applicable to cases of a similar character to the one now presented, as to render it unnecessary to enter upon a discussion of the subject here. In the cases of Tenney v. Foote, 4 Bradwell, 594, Webster v. Sturges, 7 Id. 560, and Beveridge v. Hewitt, 8 Id. 467, we held that time contracts, made in good faith, for the purchase and sale of grain or other commodity, are prohibited by neither the common nor statute law, and are not repugnant to a sound public policy. Where it is the intention of the parties that the vendor shall deliver, and the vendee receive the property sold, and there is no other element of illegality, either in the terms of the contract, or in its consideration, the contract is valid, though the time of the delivery may, within fixed and reasonable limits, be optional with one party or the other. The form of the contract, however, is by no means conclusive of the true nature of the transaction. That must be determined from the real intention of the parties. If such contracts are made as a cover for gambling, without any intention to deliver and receive the commodity, but merely to pay the difference between the price agreed upon, and the market price at a future day, they are within the statute against gaming, and void.

The case of Tenney v. Foote was taken by appeal from this court to the Supreme Court, where the judgment of this court was affirmed upon other grounds than the principal question involved, but the court said: " We may add in conclusion, we see no objection to the law as announced in the opinion adopted by the Appellate Court, and written by the circuit judge, who was formerly a distinguished member of this court."

From the views expressed by us in the cases above re-

ferred to, we feel no inclination to recede, believing them to be wise and salutary, and calculated to conserve not only the best interests of the community at large, and to check the prevailing wide-spread mania for gambling speculations, but also to restrain the members of a great and doubtless useful, as well as necessary, association of business men, from permitting themselves to become instrumentalities in a course of dealings which the law denounces as contrary to public policy, illegal and void.

We are also fortified by more recent decisions of the courts in other States, whose rulings are in substantial accord with our own. And we think it may now be considered as settled by the current of adjudicated cases that contracts like those above referred to, can not be made the basis of any right of action in a civil suit by or against either party to them.

Viewed in the light of the principles above stated, we think it very clear that the various contracts and deals between the parties to the present action, including the one now in suit, were mere speculations in differences, with no intention or expectation on either side that the commodity to be bought or sold should be delivered or received. They were in substance and effect simply wagers upon the state of the market in the future.

In order to ascertain the intention of the parties to this particular transaction, it was competent to show how they were in the habit of dealing together in respect to like transactions prior to the one in controversy. Phillips v. Roberts, 90 Ill. 493; Doane v. Duncan, 17 Ill. 272. The evidence, as disclosed by the record, consisted of the testimony of Young, one of the plaintiffs, of Colderwood, the defendant, and an exhibit, containing a statement of the alleged purchases and sales. It appears that McCrea & Co. commenced dealing for Colderwood on the Board of Trade about August, 1878. The exhibit shows that during the ensuing five months to December 31st, they made fifty-nine different purchases and fifty-five sales, aggregating 600,000 bushels of wheat and 10,000 bushels of corn. During the period of about four months, in 1879, they made twenty-four purchases and twenty-six sales, aggregating

380,000 bushels of grain, mostly wheat, and 1,000 barrels of pork, making a total of 980,000 bushels of grain, and 1,000 barrels of pork. The average price of the wheat was about eighty-five cents per bushel. Here were purchases and sales which, if real and made with a *bona fide* intention and expectation that the property was to be actually delivered or received, would have necessitated the use of a large amount of capital. McCrea & Co. knew that Colderwood had no means other than a moderate salary. It is testified by Colderwood, and not denied by Young, that he repeatedly informed the latter as to his financial condition, and told him he had no business to gamble on the Board of Trade, and that Young coincided with him in thinking he would do well to keep away, that it was a dangerous place, etc. Is it within the range of probabilities that a man thus situated, with very small means, and engaged in a wholly dissimilar avocation, would go outside his ordinary business and contract for the purchase of half a million dollars worth of grain and pork, in the space of nine months, with any idea or expectation of receiving or paying for it on delivery? It is argued by counsel that only a small percentage of the purchase money is required to be paid in cash, as upon the payment of a margin other parties are readily found who will carry the goods, or before the expiration of the time for delivery, a like amount can be sold, and the deal be closed by the purchaser paying the loss, if any. In other words, he gets rid of it by paying the difference; and what, we ask, is that but dealing in differences? Nor does the suggestion of counsel that banks and capitalists furnish money to move these commodities, thus necessitating the use of but little money of the dealer, lend any support to his theory, since, as is well known, the money in such cases is not advanced upon mere outstanding contracts for purchase and sale, but upon warehouse receipts and bills of lading, which represent goods actually on hand.

The exhibits show that the numerous deals between these parties, with one or two exceptions, were all settled upon differences, without the delivery of a bushel of grain or a barrel of pork, and without the payment or reception of any money

for the goods purporting to have been bought and sold; and in no instance does it appear that Colderwood was ever called upon to receive grain purchased, and pay for it. The deals were all in form, purchases and sales for future delivery, mostly to be delivered in the following month, or the month next succeeding. They were usually settled within a few days after the commencement of the deal, and in some instances on the same day. It happened more frequently than otherwise that Colderwood sold the grain before he bought it, and we find no instance in which the deal lasted during the life-time of the option. An examination of the statement of the account between the parties, prepared by McCrea & Co., is instructive; and one in looking through it can hardly fail to perceive very clear indications that the entire line of dealings were simply dealings in differences, with no intention to deliver or receive and pay for the commodities which were the subject of the deals. It would swell this opinion to unreasonable proportions to insert the statement here.

But aside from the inherent improbability, under all the circumstances of the case, that the transactions in question were intended as actual purchases and sales, the direct testimony of the parties tends strongly to show the contrary. The defendant, Colderwood, swears explicitly that it was well understood between the parties at the outset, that no grain was to be delivered or received, and paid for, but that the trading was to be merely in differences. He says, that when he introduced the subject to Young, he told him he wanted to gamble on the Board of Trade.

Young, when called in rebuttal, says he has no recollection of its being put in that light. He admits that McCrea & Co. never called upon Colderwood at any one time for more than $1,000, and they never asked him to have the money ready to meet contracts at their termination, so as to pay for the wheat, and he assigns as his reason for not doing so, that " there was never any occasion to ask him to take the wheat; it was sold out before the maturity of the contract. Usually, all the deals were for future operations, and were closed out before they matured."

When asked, "Did you ever expect him to receive the wheat, and pay for it at the market price," he answers "probably not." "Did you ever expect him to deliver to you any wheat or grain receipts, representing wheat in any contract or sale?" he answers, "probably not." There is other testimony in the record of similar import, and but one conclusion can be drawn from it. Indeed it seems difficult for the commission brokers themselves, when describing dealings of this kind, to use terms which do not betray the real nature of the transaction, for although they speak of them as purchases and sales, as though actual transfers of the property had been, or were to be made, the attending circumstances show plainly enough that the real transaction was only a deal in differences.

It is unnecessary to pursue the subject further. We think the learned judge before whom the case was tried drew a wrong conclusion from the evidence in the case; and being clearly of opinion that the transaction in question was merely a deal in differences, and not a *bona fide* contract for the purchase and sale of the grain for actual delivery, the judgment of the court below is reversed and the cause remanded for a new trial.

Reversed and remanded.