Carroll v. Holmes.

## Charles W. Carroll
### v.
## Thomas B. Holmes.

24  453
167s 396
167s 401

24     453
e115 ¹552

*Negotiable Instruments—Action on Note—Gambling Contracts—Sec. 131 Criminal Code—Mutual Intention—Evidence—Parties—Payment by Note.*

1. In an action upon a promissory note, it is *held:* That the defense that almost, if not quite, the entire consideration for which it was given, was losses incurred by the maker in dealings between the parties in options, is fully sustained by the evidence; that the evidence also shows the illegal intent to have been mutual; that it was unnecessary to show that the parties with whom the plaintiff dealt on the defendant's account, knew of the latter's intention not to take the grain and pork bought and sold; that the plaintiff could not recover upon any items of the original indebtedness without surrendering the note for cancellation either before suit or at the trial; that he can not maintain an action on the note and on some of such items at the

same time; that the plaintiff was not entitled to open and close the argument on the evidence, the burden of proof being on the defendant; and that there was no substantial error in giving and refusing instructions.

2.   A secret illegal intent in one party not known to the other will not invalidate a contract.

3.   The acceptance of a promissory note is *prima facie* the satisfaction and payment of an open or book account, or antecedent debt, for which it is given.

[Opinion filed December 9, 1887.]

APPEAL from the Circuit Court of Marshall County; the Hon. T. M. SHAW, Judge, presiding.

Mr. FRED S. POTTER, for appellant.

There is a total absence of proof as to who the Chicago parties were with whom the contracts were made, and as to their intention; without affirmative proof from the defendant as to who were such parties and their intention, the verdict in this case can not be maintained.

Having given his orders for corn, corn to be delivered to him, the plaintiff is bound by his orders.   Miller v. Bensley, 20 Ill. App. 528; Wolcott v. Heath, 78 Ill. 433; Prixley v. Boynton, 79 Ill. 351; Cole v. Milmine, 88 Ill. 349.

If all of the other matters between the parties be expunged as founded on losses in unlawful ventures, yet it will not bar a recovery for money loaned long before the alleged unlawful dealings had in their inception; nor for money which the defendant actually paid to him and charged in account with the defendant's knowledge and consent.   If it be found that the board of trade contracts were unlawful, then the defendant must repudiate all or none ; he can not appropriate to himself the proceeds of such as were to his advantage and disavow all others.   Wolcott v. Heath, 78 Ill. 433.

Messrs. BURNS & ONG, for appellee.

The intention of the law is to prohibit persons from dealing thus knowingly, as agents or otherwise; no room is left for avoiding the law by pretended agencies or by other means which the ingenuity of men may invent to escape liability and

enforce the most pernicious contracts; neither can an assignee of an obligation tainted with such contracts, in whole or in part, enforce such contract. Tenney v. Foote, 4 Ill. App. 594, and numerous other cases cited; also Webster v. Sturges, 7 Ill. App. 560; Beveridge v. Hewitt, 8 Ill. App. 467, and numerous other cases cited.

All dealings in puts and calls are illegal and void, and can not be enforced if the taint remains as to any part of the promissory note given upon adjustment of such contracts; any fraudulent gambling contract entering into such note renders the whole instrument void, and the court will not inquire as to whether part of the transactions are legal and part illegal. 1 Parsons on Contracts, 380; Henderson v. Palmer, 71 Ill. 579; Nash v. Monheimer, 20 Ill. 215; Munsell v. Temple, 3 Gilm. 93; Wheeler v. Russell, 17 Mass. 257; Chitty on Contracts, 730; Tenney v. Foote, 95 Ill. 99; Metcalf on Contracts, 216.

The cunning devices of artful men to cover up frauds by rules and regulations of the board of trade and others dealing in puts and calls, are not allowed to avoid responsibility arising from such contracts, no matter what form may be adopted as to rules and regulations, or as to the form of contracts; the court will always inquire into the intention of the parties, look into all the surrounding circumstances and facts, and determine what the spirit of the contract really is. The acts, the conduct of the parties, have a controlling influence in determining what the intention is. Tenney v. Foote, 4 Ill. App. 594; Webster v. Sturges, 7 Ill. App. 560; Beveridge v. Hewitt, 8 Ill. App. 467; Pickering v. Cease, 79 Ill. 328; Lion v. Culbertson, 83 Ill. 33; Kreigh v. Sherman, 105 Ill. 49; Brand v. Henderson, 107 Ill. 141.

BAKER, J.   Carroll brought assumpsit against Holmes upon a promissory note for $1,434.60, dated March 12, 1885, and due four months after date. The declaration contained two special counts on the note, and the common counts.

The pleas of appellee were that the note was made without any good or valuable consideration and several special pleas;

and the pleas all averred that the note was the only cause of action. Issues were formed upon the pleas, and the results of a jury trial were a verdict and judgment for the defendant.

The principal contention between the parties seems to be, whether or not the consideration of the note is impeached by the evidence on the ground it was for losses on contracts negotiated by appellant for appellee for the purchase and sale of grain and other produce, the understanding and intention of the parties at the time being that no grain or produce should in fact be received or delivered, but that appellee should have the option to close the contracts when he saw fit, and make settlements upon the basis of the difference between the contract prices and the ruling market prices in Chicago.

Sec. 130 of the Criminal Code provides that whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain or other commodity, shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and that all contracts made in violation of said section shall be considered gambling contracts, and shall be void. Sec. 131 of the Code provides that all promises, notes, bills, bonds, covenants, contracts, agreements, judgments, mortgages or other securities or conveyances made, given, granted, drawn or entered into, or executed by any person whatsoever, where the whole or any part of the consideration thereof shall be for any money, property or other valuable thing won by any gaming, or bet upon any unknown or contingent event whatever, or for reimbursing or paying any money or property knowingly lent or advanced at the time and place of such bet, to any person or persons so betting, shall be void and of no effect.

In the case of Pearce v. Foote, 113 Ill. 228, the Supreme Court say: " The true idea of an option is what are called, in the peculiar language of the dealers, ' puts' and ' calls.' A ' put' is defined to be the privilege of delivering or not delivering the thing sold, and a ' call' is defined to be the privilege of calling for or not calling for the thing bought. Optional contracts, in this sense, are usually settled by adjusting market values, as the party having the option may elect.

Carroll v. Holmes.

It is simply a mode adopted for speculation in differences in market values of grain or other commodities. It must have been in this sense the term 'option' is used in the statute. Such a contract is obviously fictitious, having none of the elements of good faith, as in a contract where both parties are bound, and is defined by statute as a gambling contract."

According to the evidence in this case Holmes delivered his orders for the purchase or sale, for future delivery, of grain or pork to Carroll, at Henry, and the latter transmitted them to Dow, a Chicago commission merchant, and guaranteed their performance by Holmes; and Dow found either a seller or purchaser as required, and charged a commission for so doing, which he afterward divided with Carroll. The contracts made were legitimate and valid upon their faces, and apparently contemplated nothing which was in contravention of the statute or opposed to the policy of the law. There was nothing, then, in the dealings between the appellant and appellee, or in the contracts, which was invalid, unless there was a mutuality of illegal intent, for it is a settled rule of law that a secret illegal intent in one party not known to the other will not invalidate.

There is no doubt of the illegal intent of appellee in these transactions, for he testified upon the trial that he did not intend to deliver any of the grain that he sold, or receive any that he bought, and there is nothing in the evidence tending to contradict him. It would seem, however, that he never in words communicated this intention to appellant, for he further stated that he never told Carroll that his intention was not to take the stuff he bought, nor that he did not intend to deliver the stuff he sold, and that in no case was there any expression of any intention to deliver or not deliver any of the commodities. Appellant testified that all of the transactions were actual and not fictitious; that they were not options but were for pork and grain to be delivered; that there was no understanding that the deals were to be anything but real and actual, and that Holmes would have received all of the pork and grain on his contracts if he had not closed them out before maturity. Notwithstanding these statements of the parties, the jury

found that it was the intention of both of them, at the times the orders to sell or to buy were given, that no grain or pork should be either delivered or received, but that the contract should be closed out before maturity and settlements made on differences between contract and market prices.

This was necessarily the finding of the jury under the verdict they returned, for they were explicitly told by the court, in numerous instructions, that the legal intent of Holmes alone would not vitiate the contracts, but that the burden of proof was upon him to establish by preponderance of the evidence that Carroll knew at the times that the sales or purchases were made upon orders that the articles were not to be delivered or received; that the contracts for future delivery were not rendered unlawful or void by the fact that the parties may thereafter and before the maturity of the contracts have rescinded the same by agreement upon the understanding of the payment of differences in price; and that they had no right to find that the deals were not real unless the greater weight of the evidence proved they were not real.

The jury having found as matter of fact that appellant had knowledge the contracts in question were gambling contracts, the question arises whether or not the evidence sufficiently sustains such finding. No matter what the forms of the several transactions were upon their face, yet if the facts and circumstances in proof show that such forms were colorable only, and that it was the real understanding of both parties that there were to be no actual sales, no delivery or acceptance of the subject-matters of the contracts, but that damages were to be adjusted upon differences, then they were gambling transactions and within the purview of the statute, and this, whether the real intentions of the parties were formally expressed in words or not. It is altogether legitimate to look at the surrounding circumstances in order to ascertain and determine the mutual understanding and real intention of the contracting parties. From the facts and circumstances found in this record, from the course of dealing for a long series of months between appellant and appellee, and the character of the numerous transactions between them, we think the jury

Carroll v. Holmes.

was fully justified in concluding that appellant knew the commodities contracted for were not to be delivered or received, and that the sales were colorable only and not real and *bona fide.*

A sagacious and well-informed man engaged in the business of grain speculations upon the board of trade would not be likely to act so blunderingly as to render himself liable to the fines, penalties, forfeitures and imprisonment imposed by the statute by openly expressing his intention to enter into a gambling contract. Nor is it probable that he would permit the person with whom he was dealing to express in his hearing such an intention; in fact, it would be expected of him that he would absolutely and at once refuse to deal with or receive orders from any one who was so indiscreet as to thus express himself. We know from the books and from numerous cases that have arisen in the courts, that many cunning devices are resorted to by artful men engaged in unlawful speculations in grain and other commodities, in order to cover up and conceal the real character of the transactions in which they are engaged, their purpose being to make illegal gains and at the same time avoid legal responsibility and the penalties denounced by the statute.

There are many salient facts found in this record tending to prove the guilty knowledge of appellant. In the seventy or more separate dealings had between the parties, extending through a period of about eighteen months, in no single instance did Holmes permit a contract to mature on his hands; but he uniformly ordered the contracts closed before the time for delivery or acceptance arrived. At no time was a contract consummated by the actual delivery to or receipt from Holmes of the article contracted. Besides this, Holmes was living on a farm and was a man of small pecuniary means, and yet, with actual notice Holmes was in embarrassed circumstances, appellant not only quite frequently, while holding but a small sum as security or "margins," but often when holding no security whatever, guaranteed the performance of the contracts made by him on behalf of Holmes. These deals aggregated some $900,000, and ranged from 5,000 to 50,000

bushels of grain and from 250 to 3,000 barrels of pork. It is unreasonable to suppose that appellant would, under such circumstances, make himself personally responsible as guarantor for the fulfillment of so many and such large contracts, involving such considerable sums of money, if he had supposed the contracts were real and *bona fide*, and would be required to be performed.

Upon the theory the contracts were optional and fictitious, and could be settled upon the payment of differences, and by himself as broker, in default of sufficient margins, the risks assumed were comparatively insignificant. Other facts and circumstances were in evidence tending to prove the real character of the transactions, and that appellant was fully advised that the dealings with appellee were colorable only, but we do not deem it necessary to comment upon them.

It is, however, urged by appellant that it is not enough for the purposes of the defense in this case that it was defendant's intention not to take or deliver the grain and pork bought and sold, and that such intention was communicated or known to appellant, and also to Dow, the Chicago broker, but that the evidence must go further and show with whom Dow made the contracts, and that they also knew defendant's intention, and consented to and did deal in "puts" or "calls."

The evidence shows that the dealings of Holmes were with Carroll and with him alone, and that they each relied solely upon the credit of the other; that the dealings between Carroll and Dow were between themselves alone and that they each relied solely upon the credit of the other; and that the contracts made by Dow in Chicago were solely between him and the parties with whom he contracted, and that he and such parties respectively, relied only upon the credit of each other; and that neither Holmes nor Carroll had any notice or knowledge with whom Dow made the contracts. The question here at issue is with reference to the agreements, dealing and understanding between appellant and appellee, and not in regard to the knowledge and understanding of these other and remote parties. If the understanding between appellant and appellee was that the deals as between themselves should

be settled upon differences, and that there should be no delivery of the commodities which were the subject-matter of the deals, then the contracts as between said parties were gambling contracts and within the statute.

The doctrine of agency has no application to the matter so far as the question of a violation of this penal statute is concerned; it was so expressly decided in Pearce v. Foote, 113 Ill. 228.

The case just cited is an authority in point to show that notice of illegality to Dow, and those with whom he dealt in Chicago, was not necessary to the defense in this litigation. Were the character of proof insisted upon by appellant, required, it would be difficult, if not impossible, to enforce the provisions of the statute.

It is a further contention of appellant, that as he had interposed a replication to the pleas which traversed the fact alleged therein, that the several causes of action in the declaration were one and the same, and also averred that he relied upon each and every cause of action in his declaration mentioned, he was, therefore, in any event, and even if the grain and pork contracts were unlawful and void, still entitled to verdict and judgment for $159.60. He testified on the stand that he had paid to the defendant in actual cash $159.60 more than he had received from him, even after deducting the proceeds of the oats that appellee delivered to him in his warehouse. Waiving the fact that appellee claims these cash items were all paid, we do not see any force in the point thus made.

It is admitted by appellant that the note for $1,434.60 was executed in full settlement of the account he held against defendant, and that the cash items from which this $159.60 is deduced, were all included in said account. The acceptance of a promissory note is *prima facie* the satisfaction and payment of an open or book account, or antecedent debt, for which it is given. McConnell v. Stettinius, 2 Gilm. 707; Ralston v. Wood, 15 Ill. 159; Smalley v. Edry, 19 Ill., 207; Morrison v. Smith, 81 Ill. 221; Kappes v. The Geo. E. White Co., 1 Ill. App. 280; Fridley v. Bowen, 5 Ill. App. 190.

Appellant having taken a note in payment of the account,

could not recover upon any items of the original indebtedness without surrendering the note for cancellation, either before suit brought or, at the latest, upon the trial and before the cause was submitted to the jury. Stevens v. Bradley, 22 Ill. 224; Heartt v. Rhodes, 66 Ill. 351.

It is suggested that the giving of a void note is not the payment of a lawful claim, and further, that the giving of a voidable note, when avoided, does not work a payment or bar against the recovery of a lawful demand which entered into and formed a part of the consideration of the voided note. This doctrine seems to be just and reasonable. It does not, however, have application to the present controversy. Appellant contended upon the trial, and is still contending in this court, that the note was and is valid and legal. Had he admitted the note was void and of no effect, he might consistently have taken the position stated and have sued for the recovery of the $159.60. But he can not be permitted to blow both hot and cold with the same breath, and recover both upon the note and upon the original cause of indebtedness.

It is a sound rule of law, that a party can not occupy inconsistent positions and pursue inconsistent courses of action. Herrington v. Hubbard, 1 Scam. 569; Derickson v. Krause, 4 Ill. App. 507.

The statute provides, in express terms, that where the whole or any part of the consideration of a note is for money lost by any gaming, or by wager or bet upon any unknown or contingent event, then such note shall be void and of no effect. It is fully shown by the evidence and admitted by appellant that almost, if not quite, the entire consideration for which the note was given was losses incurred by appellee in his dealings in grain and pork contracts through the orders given by him to appellant. And, as we have already held, the evidence supports the finding of the jury, that these dealings between appellant and appellee were gambling contracts.

That which we have said above with reference to the matter of the $159.60, sufficiently disposes of the assignment of error that the trial court erred in denying to the plaintiff the

opening and close of the argument to the jury on the evidence. The burden of proof was upon the defendant in the trial; and no injustice was done the plaintiff by the ruling of the court.

The instructions of the court, given at the instance of appellee, seem to have been substantially correct. We are inclined to think that one of them stated an abstract proposition of law that had no very apparent application to the case; and that several of them were not technically accurate; but we find no serious objections to any of them. The jury was instructed by the court very fully and liberally upon behalf of appellant. Some eighteen instructions asked by him were given without any modification.

Of the qualifications made in the three that were modified by the court, some were entirely proper and the others unimportant.

Of the seven which were absolutely refused, some were duplicate of instructions that were given, some did not accurately state the law, and some had no proper bearing upon the issues and were calculated to mislead the jury.

We find no error in the record of sufficient importance to reverse the judgment, and it is therefore affirmed.

*Judgment affirmed.*