CHARLES H. WHEELER

v.

JOHN J. McDERMID ET AL.

*Gaming—Contract to Buy and Sell Grain on Future Delivery—Brokers—Evidence—Instructions.*

1. In assumpsit for commissions and money advanced by plaintiff on defendant's account in transactions on the Chicago Board of Trade in buying and selling grain, this court holds that the transactions were illegal.

2. A contract to buy and sell grain on future delivery with the intention, not of actual delivery, but of making a settlement by paying the difference. between the agreed and the market price, is a gambling contract.

3. The burden of proving the legality of such a contract is on him who seeks to enforce it.

4. Where an indivisible demand is in part illegal, no recovery can be had for any part of it.

5. An agent or broker who knowingly executes an illegal transaction for his principal can not recover money advanced in furtherance of it.

6. Where there is no evidence on which to base it, an instruction should be refused.

[Opinion filed May 28, 1890.]

APPEAL from the Circuit Court of Ogle County; the Hon. WM. BROWN, Judge, presiding.

Messrs. HATHAWAY & BAXTER, for appellant.

Messrs. E. H. & N. E. GARY, for appellees.

C. B. SMITH, J. This was an action in assumpsit on the common counts brought by appellee against appellant to recover a balance claimed to be due on account of commissions and money due appellee for advances paid to the use of appellant growing out of certain transactions in grain on the Board of Trade in Chicago. Appellant pleaded, first, the general issue; second, the statute of limitations, and third, that the consideration of appellee's claims was the product of gambling transactions on the Board of Trade. A trial before the court and a jury resulted in a verdict for appellees for $2,119.90, upon which the court gave judgment after overruling a motion for a new trial. The appellant now prosecutes this appeal, brings the record here, asks for a reversal and assigns the usual errors.

The errors chiefly relied upon here, are that the verdict is against the evidence and that the court erred in instructing the jury.

The material facts connected with and surrounding the transactions involved in this suit are about these: Appellee is a member of the Board of Trade in the city of Chicago,

Wheeler v. McDermid.

and buys and sells for his customers on commission, as a part of his transactions on the board. Appellant was and is a minister of the gospel living in Ogle county, Illinois.

Appellant was introduced to appellee by a mutual friend on the 3d of August, 1882. After appellee had invited appellant and his friend to visit the Board of Trade and shown them around he informed them that "If at any time he could do anything for them he would be pleased to do it." Appellant then expressed a doubt as to the propriety of a minister dealing on the Board of Trade, but appellee said it was just as legitimate as to buy a horse.

Appellant went again on September 6th to appellee's office and told him he thought he would "speculate" a little in future months of grain. It was then agreed he should deal in corn at the suggestion of appellee.

Appellee's detailed statement of his account attached to this declaration is the shortest way to tell what followed with its consequences to appellant.

COPY OF ACCOUNT SUED ON.

C. H. WHEELER, Creston, Illinois.

In account with McDERMID, RUSS & Co., for use of J. J. McDermid.

Please examine at once and report if correct.    Chicago, Ill.

| 1882. | | | | 1882. | | | | |
|---|---|---|---|---|---|---|---|---|
| Nov. 10. | To loss on sales | $1,012.50 | Sept. | 6. | By cash | $ | 400.00 |
| 13. | " " " " | 1,587.50 | 13. | " " | | 450.00 |
| 18. | " " " " | 2,543.75 | Oct. | 14. | " profits on sales | 750.00 |
| Dec. 15. | " " " " | 2,937.50 | 19. | " " " | 25.00 |
| | | | 12. | " " " | 112.50 |
| | | | 24. | " cash | 1,000.00 |
| | | | 30. | " " | 1,997.50 |
| | | | Nov. | 9. | " profit on sales. | 668.75 |
| | | | 14. | " " " | 1,118.75 |
| | | | Dec. | 15. | " balance | 1,558.75 |
| | | $8,081.25 | | | | $8,081.25 |

Dec. 15. To balance..............................................$1,558.75
Interest to April 1, 1888..............................................    495.00
Due April 1, 1888..............................................$2,053.75

An analysis of this account shows that from September 6th to December 15th, appellee had won as profits on his deals

$2,675, and that he lost within the same time of his "specu-lations" $8,081.75, leaving a balance against him of $5,326.25.

The account further shows that during this time he paid to appellees the sum of $3,947.50 in cash to keep good his margins. At the conclusion and final statement of the account appellant finds that his $3,947.50 is all gone with a debt of $1,558.75 still standing against him. This account shows a net loss of $5,506.25 to appellant as a result of his speculation in a little over two months. Appellant now contends that this whole transaction was a gambling scheme and void under the statute. Appellee on the contrary insists that it was a real and *bona fide* transaction and was an actual buying and selling corn for future delivery to the buyer. Was it so? We think it was very clearly not so, in fact, nor intended to be so. Appellant swears that he told McDermid (appellee) when he first entered upon this arrangement to "speculate" on the board, that he did not want any grain delivered to him, and although appellee denies this statement we think all the facts and circumstances in proof support appellant. Appellee knew appellant was a clergyman, and that he was not a dealer in grain and did not reside in Chicago, and that he, in fact, had no grain to sell and that he had no facilities for receiving grain in Chicago, and that he was without any experience or knowledge in the perilous enterprise he was then about enter-ing. Appellant then expressed doubts about the propriety of the business for a minister of the gospel, but he is assured by McDermid that it is a legitimate business. If appellant was going to buy 400,000 bushels of corn of McDermid in good faith, to be delivered in May or January, and if they both understood the corn was then to be delivered to appellant, and that McDermid was then to be paid the market price for the corn, then all the world would know that was a strictly legal transaction and there would have been no necessity for any discussion between the parties as to the morality, pro-priety or legality of such a transaction.

The very fact that the conscience of this honest clergyman pricked him as he stood in the charmed circle of the "corn pit" and watched the conflict between the "bulls and bears,"

and looked with longing eyes upon the golden calf he was about to worship, is a circumstance not without signification as showing what the intention of appellant was.  The proof shows that between September 6th and December 15th of the same year, appellee bought and sold for appellant as his agent or broker, as stated by appellee himself, "hundreds . of thousands of bushels of corn."  On a single day appellant sold 400,000 in two sales of 200,000 each.  One single purchase was for 400,000 bushels; and yet not a bushel of corn was ever seen, received or delivered, demanded or refused, or tendered by anybody named in this record, nor any warehouse receipts shown or produced, or offered to be produced.  True, appellee and his clerk swear that a large amount of this corn was delivered, but to whom or how it was delivered they do not say.  There is no pretense that appellant himself received any of his princely purchases, nor that he delivered any of his sellings, nor that he authorized appellee to either deliver or receive corn for him.  The only proof of any actual delivery of anything on the part of appellant was of his honest cash.  Nichols testifies to knowing that 75,000 bushels of corn were delivered because he saw it on the books, but he did not make the entry or deliver the corn.  McDermid swears that he had a book there showing the names of all persons of whom he bought and sold corn, and that the grain was delivered on the Board of Trade in every case, but the book was not produced, nor any man who delivered an ear of the corn, nor the transfer of any warehouse receipt.  McDermid does not pretend to have actual personal knowledge of the delivery, but says the book shows it.  McDermid swears that only in something over one-tenth of the deals on the Board of Trade was there any actual delivery of grain.

We think the delivery mentioned by appellee, in the light of all the evidence, and in the total absence of all facts which would indicate any actual delivery of real corn, or anything to represent actual corn, must be regarded as highly apocryphal and that there was, in fact, no more delivery of corn than there was of buying and selling corn, in fact.  Book

entries seem to have been the only evidence of either buying, selling or delivery. It is perfectly certain that appellant never did have any corn for appellee to deliver to anybody, for nobody pretends to have delivered him any, nor to appellee for him. His deals were all closed out long before he was entitled to receive corn under his purchases, and before he was bound to deliver any under his sales. Where, then, did appellee get this 75,000 bushels of corn he pretends to have delivered for appellant? Was this country parson a merchant prince that he could "corner" the corn of Illinois, or a Joseph that he could buy and crib such vast quantities of corn without money and without credit? To believe that such a thing was possible is to tax credulity to the utmost limit, and to substitute for reason and common sense, mere fairy tales, and gullibility that would put Baron Munchausen himself to shame.

It is most unreasonable and extremely improbable to suppose that appellee for one moment supposed or thought that appellant could receive or deliver any of these immense purchases and sales, or that he could either pay for them if offered to him, or go into the market and buy the corn for delivery if it had been demanded of him. To justify an honest belief on the part of appellee that appellant intended to receive and deliver the immense volume of corn he was buying and selling for him, there must have been some facts in existence upon which to predicate such marvelous faith. There is a reasonable intent behind every intelligent human action, and when it becomes important to determine what the motive or intent was, it is much safer to have resort to the conduct and action of the parties to determine it, than to look to mere declarations of a party as to what the intent was.

We think by applying this test to determine the real nature of the transaction involved, and to get at the real intention of the parties, that the delivery mentioned by appellee was nothing more or less than swapping trades or balancing one mythical transaction against another of the same kind, and so finding a balance against one party or the other, and make him against whom the balance is found make it good.

This is, indeed, the explanation given by appellee himself

as to the mode of settling Board of Trade deals when actual delivery does not occur.

Can there be any fair claim, or pretense based on reason and the observation of men, that any such transaction is real or *bona fide?* We think not. Again, we do not understand from the evidence in this record, or from the argument of counsel for appellee, that a single dollar of the $3,497.50 actually paid to appellee by appellant, or of the $2,675 of the profits made by appellee, ever was used to pay for any corn; in fact. What then became of this $6,022.50? What did appellant do with it? He paid it out to keep up the equilibriums between these fluctuating, mythical transactions, which were to be balanced in May or January, or at such other times as was agreed upon, in order to keep the transaction alive until the date agreed upon for its termination or adjustment, in order that appellant might then show in the balancing transaction with the possible chance of finding the difference in his favor.

In other words, this money was all consumed in the payment of margins instead of corn. As showing the real character of these transactions as appellee understood them, we will quote from the testimony of appellee McDermid himself:

" *We didn't deliver the corn to Mr. Wheeler. He didn't want us to. He couldn't deliver.* They wouldn't allow him to. We made the contracts with other members of the board. We were representing Mr. Wheeler. He gave us a margin of $400, then $450, and $1,000, and $1,997.50. That is the actual amount he sent us. We never paid him a dollar. We were doing a commission business and nothing else. All transactions on the Board of Trade are carried out in good faith. They have to be, unless a man fails. Such a thing as settling differences on the Board of Trade between the parties by cash payments is unknown; money is paid when article is bought at one price and sold at another. Money is paid to settle differences. The proportion of deliveries is very large indeed. *I should say that a good deal more than one-tenth of the transactions there are actual deliveries.*" In a few

minutes afterward he swears "that grain was delivered to members of the Board of Trade in every case."

In another part of McDermid's testimony he swears, in speaking of the delivery of this corn, "I have stated that I found where 75,000 bushels were delivered directly. I know 75,000 bushels were delivered; the balance was closed by offsets."

Upon appellee's own testimony there were 25,000 bushels of this corn disposed of by settling differences between the market and the purchase price by simply offsetting one deal against another, which is in violation of the statute. His claim is to recover for the losses sustained in this entire transaction. Where a part of entire consideration of a contract is illegal, or where an indivisible demand not susceptible of division is in part illegal, the illegal part taints the whole so that no recovery can be had for any part of the demand. Tarry v. Foot, 95 Ill. 99.

Just what appellee means in all his statements is not quite clear, but that he has quite a free and off-hand way of testifying is quite apparent. It is hardly probable that he is sufficiently well acquainted with all the Board of Trade transactions to justify him in saying of his own knowledge they are all carried out in good faith. In one sentence he says "settling differences on the Board of Trade between the parties by cash payments are unknown," and in the next sentence he says: "Money is paid when article is bought at one price and sold at another; money is paid to settle differences."

Again speaking of deliveries he says: "*I should say in a good deal more than one-tenth of the transactions there are actual deliveries.*"

If this statement is correct, it tends strongly to support appellant's theory that at least some of the transactions on the Board of Trade are colorable only, and have little or no real connection with corn or wheat. On the trial a number of letters were read, showing the correspondence between the parties. To further show what appellee understood the nature of these transactions to be, we quote from three of his letters to appellant.

In his letter of December 26, 1883, to Wheeler, McDermid, among other things, says:  *  *  *  " We never seek to influence any man's judgment, provided he has money to protect his trades.    You insisted on trading in such large amounts that we were obliged to urge closing some of it, to prevent our making a loss, and the sequel shows that if a loss had been made on the other side, we could not have gotten our money without difficulty."

Again, on February 19, 1883, McDermid writes Wheeler *  *  *  " On that (Professor McMillan's) recommendation, we trusted you or rather I trusted you, because your trades would have been closed when the margin expired, had it not been for me."

Again, in September 7, 1882, appellee writes to Wheeler : *  *  *  " We regard it cheap for a long deal, but if you wish to take a little money and wait for another decline, please advise us at what figure we shall sell it out; you know, of course, you can sell at any time and draw your profits and margins as soon as sold."

The expressions used in these letters by appellee are not apt for describing a real *bona fide* sale or purchase of corn to be delivered at any day in May, at the option of the seller and to be controlled by the seller, but exactly the reverse. If the seller fails to keep his margins up to the market, then he loses all control of the supposed corn he is to deliver, and his own broker takes charge of the deal and sells him out without consulting his principal.

A good deal of stress both in testimony and in argument of counsel is placed upon the fact that appellee was exclusively a commission merchant, and that he executed appellant's orders exactly as given.    There is no merit in this claim.    An agent or broker who knowingly engineers and executes an illegal transaction, and advances money to secure its accomplishment can no more recover his money than one of the principals.    Irwin v. Williams, 110 U. S. Rep. 225.

Although appellee in this case seeks only to recover for the loss on the last sale of 100,000 bushes of corn, and seeks to limit his testimony only to that part of the dealings between

the parties, still his account filed, and the proof before us, disclose the nature of the entire transaction, and show them all to have been gambling contracts.

We think the verdict is very clearly against the weight of the evidence and that it was error in the court not to set it aside.

Appellant also insists the court erred in giving appellee's 4th instruction, which reads as follows:

" The court instructs the jury that even though it was arranged or understood between the plaintiffs and the defendant that the sales and purchases to be made on account of or for the benefit of the latter, should be so made that there should be, before the time of delivery should arrive, as much of any certain commodity sold as there should be purchased so that as between the plaintiffs and the defendant, the sales might be offset against the purchases, yet, if it was also further arranged or understood at the same time that all the contracts for sale or purchase to be made, should be lawful and for actual delivery, then the whole contract or arrangement as above stated, was not unlawful." (*Given.*)

The first objection to this instruction is, that its different clauses are inconsistent and repugnant to each other. If the hypothesis supposed in the first part of the instruction was established by the proof, then the second member of the proposition could not exist and could not be performed, or certainly would not be, for no occasion could arise after the contracts were balanced before the day of delivery and thus canceled, for an actual delivery on the day set for such delivery. But the first clause of this instruction is directly within the prohibition of the statute, and informs the jury that the parties may do what the statute declares they shall not do, and this palpable misdirection was not cured by the second clause, adding that still, if they agreed at the same time the transaction should be lawful and the grain should be for actual delivery, the whole arrangement would not be unlawful.

The instruction all taken together means simply that if parties contract to do an unlawful thing and afterward execute such unlawful contract, still if they further agree that such

contract should be lawful and they reserved the right to do some act to make it lawful, but never performed the act necessary to make it legal, the whole transaction would be legal.   It will hardly be seriously contended that a transaction prohibited by law can be made legal and valid by simply calling it so.

The first clause of this instruction falls within the definition of a gambling contract laid down by the Supreme Court of the United States in Irwin v. Williams, 110 U. S. Rep. 225. The court say:   " When brokers in form make contracts for future delivery in their own names with other brokers claiming to base said contracts upon orders received by them from persons whose names they do not disclose, and when, from all the facts and circumstances surrounding the transactions it appears that no actual delivery was intended, but merely the settlement and payment of differences, such brokers can not receive from those undisclosed principles money paid out by them in their own names."   In Barnard v. Backuss, 52 Wis. 593—" When contracts are made as a cover for gambling, without intention to deliver and receive the grain, but merely to receive the difference between the price agreed upon and the market price, at some future day, they come within the statute of gaming and are void in law."

" To uphold such a contract it must affirmatively and satisfactorily appear that it was made with an actual view to deliver and receive the grain and not as an evasion of the statute or as a cover for gambling transactions."

And in Carrol v. Holmes, 24 Ill. App. 453, the court say : "No matter what the forms of the several transactions were on their face, if the facts and circumstances show that such forms were colorable, and that it was the real intent of both parties that there were to be no actual sales, no delivery or acceptance of the subject-matter of the contracts, but that the damages were to be adjusted upon differences, then they were gambling transactions and within the purview of the statute." Pickering v. Cease, 79 Ill. 328; Lyon v. Culbertson, 83 Ill. 33.

The foregoing cases and many others which might be cited hold that all such contracts as are to be settled by merely ascer-

taining differences between the agreed price and the market price, and when it does not affirmatively and satisfactorily appear that there was an actual intention on the part of the buyer to actually receive, and on the part of the seller to actually deliver or make a *bona fide* offer to deliver, the grain itself, or a warehouse, or other valid receipt or voucher calling for and representing actual grain, then, as to all such contracts they are held to be merely colorable and are within the statute against gambling, and in all such cases the burden of proving the legality and good faith of such transactions is upon him who asserts its legality and seeks to enforce it.

We must not be understood as holding, that, when either one of the parties is acting in good faith, and entering into his contract with a present intention to carry it out, and does so carry it out, or offer in good faith to do so, with an ability to make his offer and contract good, that he may not enforce his rights against the other, although the other may not be acting in good faith.

The fourth instruction was directly contrary to all the decisions we have above cited, and contrary to the principles we have announced; it was against the plain language of the statute, was erroneous, and should not have been given. Its effect was to eliminate the entire defense from the case. The fifth instruction given for appellees is open to the same objections as the fourth and should not have been given.

Refused instruction number three, offered by appellant, was properly refused. While it contains a correct principle of law there were no facts in the case calling for its application.

Complaint is made by appellant that counsel for appellees in the closing argument made use of language which was not justified by the evidence, and which was well calculated to prejudice the jury against him. The language complained of was to the effect that "appellant Wheeler's counsel knew that the plaintiff was able to show that this was not the first transaction of the kind in which the defendant Wheeler has laid down under his obligations to those who were carrying out his orders in deals like the one in question." While we should not reverse this case upon that ground we must

express our disapprobation of the use of the language. It was well calculated to influence the jury against appellant and on account of his calling excite a feeling of hostility to him. Matters not in proof, which tend to degrade litigants or to in any wise impeach their character or honesty beyond what the evidence shows or tends fairly to show, should be rigidly excluded from the jury, and any attempt of counsel to drag before the jury, directly or indirectly, matters not in evidence or fairly inferable from the evidence, is an abuse of the principle of counsel and ought to be instantly rebuked by the court. This practice is much more mischievous in a closing argument where no reply can be made.

For the errors above indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*