Benjamin H. Ehrlich, Appellee, v. Hans S. Rothschild et al., Appellants.

Gen. No. 39,687.

512

Opinion filed December 6, 1937.

TENNEY, HARDING, SHERMAN & ROGERS, of Chicago, for appellants; HENRY F. TENNEY and WILLIAM W. MILLER, of Chicago, of counsel.

WILLIAM L. BOURLAND and AARON H. COHN, both of Chicago, for appellee.

MR. JUSTICE MATCHETT delivered the opinion of the court.

Plaintiff sues to recover money alleged to have been lost to the defendants in a gambling transaction. At the close of plaintiff's evidence the court directed a verdict in favor of defendants and entered judgment on the verdict. Subsequently the plaintiff moved for a new trial on the grounds, first, that certain letters offered by plaintiff were erroneously excluded by the

court, and second, that the court erred in directing the jury to return a verdict in favor of defendants. This motion for a new trial was granted, and this appeal was perfected by defendants pursuant to sec. 77 of the Civil Practice Act (Ill. State Bar Stats. 1935, ch. 110, ¶ 205; Jones Ill. Stats. Ann. 104.077) and Rules 30 of the Supreme Court and 20 of this court.

The parties are agreed that the sole question for consideration is whether plaintiff produced sufficient evidence to warrant the submission of the cause to the jury.

The complaint was in 10 paragraphs. Defendants filed an answer in six paragraphs, admitting the first paragraph of the complaint as to the business of defendants, etc., but denying every other material allegation of the complaint. Plaintiff was the only witness called in his own behalf and his testimony, together with 38 exhibits disclosing the nature of the transactions between plaintiff and defendants during the time in question, constitutes the only evidence in the case. Plaintiff lives at 7528 North Ellwood avenue and is an attorney at law. Defendants are brokers dealing on the exchanges and in their business with plaintiff were represented by Mr. Edwin Rothschild. Prior to the transactions here in dispute plaintiff bought and sold stock and grain on the exchanges through defendants, and on June 7, 1933, plaintiff received from defendants, through Mr. Rothschild, a check for $6,437.75, in settlement of these prior transactions, concerning which no complaint is made. Plaintiff says Rothschild delivered the check to him June 7th and said that he thought he would come over and talk with plaintiff about the market, which looked good to him, and he wanted to get back into it. Plaintiff says: "I told him that I was through gambling for all time, 'you remember, I told you a year and a half ago I never wanted to see a market as long as I live.'" Rothschild replied: "Well, I know, but those things have been

said hundreds of time by better men than you, I want you to get back in because there are some good buys there. I have some good ones I want you to take a flyer on, you have got a chance to get your money back." Plaintiff said: "No, I needed this money because I have a mortgage coming due, and I needed the better part of it to pay the mortgage, and it was all the money I had and I didn't want to get back in any stocks any more."

In the six weeks that followed plaintiff talked with Rothschild 10 or 12 different times. Rothschild called on the telephone, came over once or twice; they lunched together and talked about the market; plaintiff kept telling Rothschild that was all the money he had in the world, he did not want to gamble another nickel of it, needed it to pay a mortgage; that business was bad anyway, and he had to have some money to run his office. Rothschild said plaintiff was not taking any chance because he, Rothschild, had a good one on United States Steel; he wanted plaintiff to take a flyer on a couple of hundred of United States Steel; plaintiff replied, "Well, I don't know anything about it, and I don't want to know anything about it, I want to be left alone," and Rothschild said, "Well, let me buy you two hundred steel," and he says, "You don't need to give me any money even, a couple of days, two or three days time, probably will turn you probably three or four points, as soon the market shows three or four points profit, I will just take it and credit your account."

Plaintiff says these conversations ran along until about July 17th; that on that date Rothschild again asked his permission to put in an order for 200 U. S. Steel and plaintiff says, "I told him, I didn't have anything but this money, and I had used some of that, and asked him what the price of the stock was, and I don't remember exactly now, but I know it was many thousands of dollars more than I had, and I told him

so. He says, 'You don't need to worry about the money at all, I will put the order in for you; you will get a profit out of it in two or three days and get some of your money back'; he says, 'Let me guide your hand this time.' I told him to go ahead.'' Exhibit 4 is a statement on the stationery of defendants showing this transaction to the extent of $13,210. The statement shows the transaction to have been upon ''the following terms and conditions assented to by you, viz: 1. That all transactions are subject to the rules and customs of the Exchange and Clearing House where executed. 2. That all securities from time to time carried in the customer's account or deposited to protect the same may be loaned by the broker, or may be pledged by him either separately or together with other securities either for the sum due thereon or for a greater sum, all without further notice to the customer. 3. It is also agreed that all such securities shall secure all my (our) liabilities to Sutro Bros. & Co. and Sutro Bros. & Co. are authorized in their discretion to sell all or any of them without any notice to me (us) whenever in the opinion of Sutro Bros. & Co. my (our) margin is insufficient.''

Plaintiff's exhibit 5 is a receipt from defendants for $4,000 in cash, credited upon this account. A few days later plaintiff paid defendant a further sum of $1,000. Plaintiff further testified that no offer was ever made to deliver this stock to him. On July 20th defendants wrote plaintiff his stock account required additional funds and asked for $1,300, or bankable security in the equivalent amount. On August 1st defendants again requested $3,000; on August 11th a similar request for $1,100, August 12th for $1,700, and August 14th for $1,700; on this last request was written in pencil, ''Final Request.'' On August 16th a deposit of margin to the amount of $2,300 was demanded. The words, ''Final Request'' appeared on the writing with the statement that if the matter was not taken care of

before 9:30 of the following day, "we shall be forced to liquidate your account." On August 31st defendants mailed to plaintiff a statement of account showing the purchase of this stock and payments made thereon, showing a balance of $1,090.65 due. On August 1st plaintiff talked over the telephone with Rothschild, who called him about nine o'clock in the morning and told him there had been a peg put on wheat, either the government had pegged the price so that it couldn't go below the price it had been the day before, or that the grain exchange had done it themselves so that it wouldn't go but one way, could only go up; that this was an opportunity to get back the loss he had in steel, and that he wanted plaintiff to buy 20,000 bushels of wheat. Plaintiff said to him, "Well, where do you think the money is coming from for all this? So far I have got a loss, you got me into this thing, now, with a loss in steel, and my equity is very low, I have got quite a loss there in steel, certainly I haven't any money to pay for that, let alone buy wheat." He said Rothschild replied, "It can only go one way, and if you will let me pile in here with an open order this morning" he says, "I will probably take three or four cents profit by the end of the day," and he says, "You don't need to worry about it, I can handle it all right." Plaintiff said, "Well, you started me in the thing, you got me into it, do what you please, I don't care." So he called plaintiff back and said he had got him 20,000 bushels of wheat. Witness says he never saw any of the wheat, that he wouldn't know what it looked like if he saw it; that he had no warehouse in which to store wheat and didn't need any in his business as a lawyer.

On August 1st defendant sent plaintiff a statement of the transaction in wheat, showing the purchase of 5,000 bushels September at 95¼ and 15,000 September at 95½. The statement said that the contract was made under authority of the United States Grain

Futures Act and further, "in accordance with your instructions and on the understanding that actual receipt or delivery is intended, we have today executed the above orders for your account and risk under the conditions of our standard customer's agreement including: (1) All transactions shall be subject to the rules and customs of the Exchange where such transactions are consummated, and the Clearing House of such Exchange"; with other provisions as to margins, etc. Plaintiff made another payment of $500 besides the two payments represented by plaintiff's exhibits 13 and 14 of $4,000 and $1,000. He also sent $1,000 in cash by a man in his office, making a total of $5,500. Plaintiff further says that in a conversation with Rothschild on the day that he said he was going to buy the steel shares, Rothschild said he was going to put in an order at the same time to sell it for a profit of 4 points; that he would put in the two orders at one time, so that if he got it they would immediately have an order to sell it as soon as it hit the four point profit mark, if it got there, and as to the wheat, he said he would put in two orders at the same time, whatever he got it at, to sell it at 5 cents a bushel higher. Witness said that he never had any intention to pay the balance on the 200 shares of U. S. Steel because he could not as he didn't have the money, and never intended to be called upon to pay for them; that he never intended to take the wheat, had no place to store it, etc. Plaintiff said Rothschild further told him that his "boss was bawling him out" for buying so much stuff on plaintiff's account for so little money; that Rothschild called him up practically every day, told him how the market was going, and that he let go of the wheat, and bought it back again and then let it go again; that he sold it out and then bought it back three or four different times, so Mr. Rothschild told plaintiff. About August 14th Rothschild called plaintiff and told him he was forced to get $1,700 additional margin, and

would be forced to sell out plaintiff's account. Plaintiff replied he didn't have any way of getting it for him; on the 16th when he got his final request, Rothschild said he was going to put a stop order on the U. S. Steel at a point around 42 or 43, and unless plaintiff could give him some more money his business was making him sell it out. The last money plaintiff gave defendants was his check of September 22nd for $500. September 30th plaintiff received back from defendants a check for $966.86, which was what he got back out of the $5,500 he put in.

On cross-examination plaintiff said his practice as a lawyer was mostly in divorce cases; that he first traded with defendants about a year and a half before these transactions; that before that he had known Rothschild slightly; that he was introduced to him by a lawyer named Pearlman; that he bought and sold some stock and grain through the defendants before this, and that Rothschild handled these transactions; he was not suing for losses in any of these. Plaintiff acknowledged that the legend on an exhibit that all orders for purchase or sale was with the distinct understanding that actual receipt or delivery was intended, and that similar statements were read by him; that this was "stock stuff"; that he understood that in certain respects the transactions were to be carried on in accordance with the rules of the exchange; that he gave the written order for the purchase of 200 shares of steel on July 17th; that he ordered the 20,000 bushels of wheat of August 1st and the 20,000 bushels of August 4th, and that he purchased 20,000 bushels on August 11th and 5,000 bushels on August 29th; on September 19th, 100 shares of U. S. Steel; that it would be a wild guess to say whether his net worth at the time of these transactions was $50,000; he had, however, signed a bail bond presenting a schedule in the municipal court which stated he was worth over and above all liabilities at least $50,000.

Defendants contend there is no evidence of any illegal contracts between these parties for the reason that to constitute a gambling transaction it must be made to appear that neither party intended the commodity purchased to be delivered, but both intended the transaction should be settled on differences. It was so held by the Supreme Court in *Pelouze v. Slaughter,* 241 Ill. 215, and by the Appellate Court in *Johnson v. Milmine,* 150 Ill. App. 208. In the latter case this court said that if either party acted in good faith, intending delivery and intending that the commodity should be received and paid for, the contract would be valid and binding.

Plaintiff testified that he himself did not intend to accept delivery, but he does not anywhere in his testimony say that Rothschild was so informed by him, or that he agreed to any such method of doing business. All the written evidence is inconsistent with the theory that defendants had any such intention. Plaintiff testified in substance that he knew the transactions were to be carried on in accordance with the rules of the Board of Trade and Stock Exchange. The burden of proof was upon him. It was for him to show that defendants intended to enter into a gambling transaction. We agree with the statement of plaintiff's brief that, "the intention to gamble, contrary to the Illinois Statute, is the nub of the case," and that the intention of the parties may appear from all the circumstances in evidence, as is held in *Pope v. Hanke,* 155 Ill. 617; *Jamieson v. Wallace,* 167 Ill. 388; *First Nat. Bank of El Paso v. Miller,* 235 Ill. 135; *Weare Commission Co. v. People,* 209 Ill. 528; and *Riordan v. McCabe,* 341 Ill. 506, all of which are cited and relied on by plaintiff.

Any circumstance tending to show the real intention of both parties is admissible, but it is not sufficient to present evidence tending to show the intention of only one of them. It requires two guilty minds to make a contract in violation of the statute. None of

the many cases since decided gives a clearer exposition of the law of this State on this subject and the reason for it than is to be found in the opinion of Judge McAllister delivered at *nisi prius,* but adopted by the Appellate Court in *Tenney v. Foote,* 4 Ill. App. 594, and approved by the Supreme Court in 95 Ill. 99. The conclusions there announced are also in harmony with the views expressed by the English courts in *Grizewood v. Blaine,* 11 Common Bench 525, construing a similar statute. The opinion of Judge McAllister, p. 599, speaking of the contract there involved, says: "In practice on the stock exchange, it was often the intention of the parties that no stock should be delivered, but the transaction settled upon differences. This became common, and the English statute was aimed at its repression because it was, in effect, gambling. Our statute is directed against the same evil, and extends to transactions in grain and other commodities as well as stocks. So that the word 'option' as used in the statute here, taken with the context, means a mere choice, right or privilege of selling or buying; and it is the contracting for such choice, right or privilege of selling or buying at a future time any commodity the statute was intended to prohibit, as contradistinguished from an actual sale or purchase, with the intention of delivering and accepting the commodity specified."

In the Restatement, Contracts, sec. 323, the authors say (p. 1014): "(1) A bargain purporting to be for purchase and sale is a wager if it is part of the bargain that no actual delivery of the subject matter shall be made, and that settlement between the parties shall be made on the basis of differences in market prices. But an undisclosed intention of one or both parties to a bargain does not invalidate it.

"(2) A bargain for purchase and sale, originally legal, is not made illegal by a subsequent agreement between the parties to discharge their rights and duties

by a payment based on the difference between the market price at the time of the original bargain and that at the time of the subsequent agreement.''

In the Illinois Annotations to the Restatement, sec. 523, pp. 273, 274, the Illinois cases are collected and classified. It is stated that the first subsection of the Restatement states the Illinois law as to cases involving the Illinois statute (Smith-Hurd Ill. Stats. 1935, ch. 38, § 328; Ill. State Bar Stats., ch. 38, ¶ 308; Jones Ill. Stats. Ann. 37.258) and that cases in this State involving litigation between broker and customer usually fall into two classes: One, those in which the customer retains a broker to place wagers as to the rise or fall in the prices of commodities or securities, and the other those in which the broker and his customer intend that the former shall on the latters' behalf make purchases and sales calling for actual delivery. In the first class the contract is illegal; in the second it is valid. In order that the agreement between the broker and his customer shall constitute gambling under the statute, there must be an affirmative intent by the parties not to deliver commodities or securities but to settle on differences only. The intention must be mutual and be disclosed; and in considering whether the broker and his customer intended a settlement by payment of differences, the court may consider various circumstances, such as the lack of facilities of a buyer to accept delivery of a commodity in the quantities ordered, as in *Pope v. Hanke,* 155 Ill. 617, 40 N. E. 839, 28 L. R. A. 568; *Lamson v. West,* 201 Ill. App. 251; *Campbell v. McConnell,* 214 Ill. App. 342. Also the fact that the customer is not in a business reasonably requiring the purchase or sale of the particular commodity in the particular quantities, as in *Bartlett v. Slusher,* 215 Ill. 348, 74 N. E. 370; *Wheeler v. McDermid,* 36 Ill. App. 179; *Watte v. Costello,* 40 Ill. App. 307; *Hartwig v. Booth,* 217 Ill. App. 70, although in two cases this factor is given but little

weight; *Johnson v. Milmine,* 150 Ill. App. 208, and *Ennis v. Edgar,* 154 Ill. App. 543. Also the previous dealings between parties, as in *Colderwood v. McCrea,* 11 Ill. App. 543; *Miles v. Andrews,* 40 Ill. App. 155; or even subsequent dealings, as in *Gardner v. Meeker,* 169 Ill. 40, 48 N. E. 307; also dealings between the broker and other persons at the same time and place, as in *Staninger v. Tabor,* 103 Ill. App. 330; or the fact that only small amounts as deposits are required of the customer, as in *Jamieson v. Wallace,* 167 Ill. 388, 47 N. E. 762; 59 Am. St. Rep. 302; *Pratt & Co. v. Ashmore,* 224 Ill. 587, 79 N. E. 952; *Towne v. Buckley,* 230 Ill. App. 573; or the financial inability of the customer, as in *Jamieson v. Wallace,* 167 Ill. 388, 47 N. E. 762, 59 Am. St. Rep. 302; *Pratt & Co. v. Ashmore,* 224 Ill. 587, 79 N. E. 952; *Riordan v. McCabe,* 341 Ill. 506, 173 N. E. 660, 83 A. L. R. 512; *Carroll v. Holmes,* 24 Ill. App. 453; *Doyle Bros. v. Bartelme,* 170 Ill. App. 74; *Graff v. Moench,* 181 Ill. App. 127; *Easton Farmers Grain Co. v. Fernandes Grain Co.,* 229 Ill. App. 102; *Ohlendorf v. Bennett,* 241 Ill. App. 537; or that the financial ability of the customer may be such as to warrant finding that he and the broker did not intend a settlement only by payment of differences, as in *Pelouze v. Slaughter,* 241 Ill. 215, 89 N. E. 259. If we apply the rules stated in these cases to the facts before us we find no testimony that either of the parties intended that the transactions should be settled by payment of differences. There is as to the grain (but not as to the stock) evidence of lack of facilities of the buyer to accept physical delivery, but there is no evidence that the customer could not reasonably require or conveniently use the stock or grain to the amount purchased. The previous dealings between the parties indicated purchases and deliveries with settlement, concerning which no complaint was made. The deposits of margins made seem to have been ample.

Most important, and controlling, the plaintiff was financially able to carry all of the transactions. Even if it is conceded that the letters excluded should have been received in evidence, our conclusion would not be different. Upon the whole record we are of the opinion the plaintiff failed to introduce evidence from which the jury could reasonably find that both plaintiff and defendants intended to enter into gambling contracts. It follows that the court erred in granting a new trial and that the order to that effect must be reversed and the cause remanded with directions to enter judgment upon the verdict in favor of defendants.

*Reversed and remanded with directions.*

O'Connor, P. J., and McSurely, J., concur.